William P. AKERS, Plaintiff,

v.

Shirley BONIFASI, et al., Defendants.

Civ. A. No. 3:84–0924.

United States District Court,
M.D. Tennessee,
Nashville Division.

Memorandum Sept. 24, 1984.

On Motion for Default Judgment
Nov. 2, 1984.

On Motion to Set Aside Default
Jan. 14, 1985.

On Motion for Leave to Withdraw
Aug. 8, 1985.

On Motion to Dismiss
Sept. 23, 1985.

Memorandum Opinion Nov. 14, 1985.

Nader Baydoun, Nashville, Tenn., and David Begley, Omaha, Neb., for plaintiff.

Charles McElroy and M. Clark Spoden, Nashville, Tenn., for defendants.

## MEMORANDUM

NEESE, Senior District Judge, Sitting by Designation and Assignment.

■ The filing by the defendant Mobile Telephone of America, Inc. (Mobile Telephone) of a petition in the United States Bankruptcy Court for the District of Arizona on February 9, 1984 operated automatically to stay the commencement of this action as to that debtor, but not as to the other persons named defendants herein. 11 U.S.C. § 362(a)(1); *Lynch v. Johns-Manville Sales Corp.*, 710 F.2d 1194, 1196–1197[1] (6th Cir.1983).

Accordingly, the Court will proceed herein as if Mobile Telephone had not been named a party defendant. *See in Re Thacker*, 24 B.R. 835, 837[1] (Bkrtcy.S.D. Ohio 1982) (any action taken in violation of the automatic stay is void *ab initio* even if there were no knowledge of the stay); *In Re Florida Dairy, Inc.*, 22 B.R. 197, 199[2] (Bkrtcy.M.D.Fla.1982) (same).

### ON MOTION FOR DEFAULT JUDGMENT

The motion of the plaintiff for a judgment by default against the defendant Mr. Friedman hereby is

DENIED for the following reasons:

(1) the movant has not sought and received from our clerk entry of such defend-

ant's default in accordance with the provisions of Rule 55(a), F.R.Civ.P.; [1]

(2) an acknowledgment by the defaulted-defendant of service-of-process upon him has not been filed with the Court in accordance with Rule 4(g), F.R.Civ.P.; [2] and,

 (3) the motion was not accompanied by the required affidavit, 50 U.S.C. App. § 520(1).[3]

## ON MOTION TO SET ASIDE DEFAULT

The clerk entered the default of the defendant Mr. Morris S. Friedman (a/k/a Robert Powers) on November 9, 1984 for his failure to plead or otherwise defend as provided by the Federal Rules of Civil Procedure. Rule 55(a), F.R.Civ.P. On the first business day thereafter, the defaulted-defendant served his *pro se* answer to the complaint, and, on December 5, 1984, Mr. Friedman moved the Court, through counsel, to set aside such entry of default. Rule 55(c), F.R.Civ.P. Such motion has merit.

 "For good cause shown the court may set aside an entry of default * * * ." Rule 55(c), *supra*. The criteria which must guide this Court in its determination of whether good cause has been shown by the movant were set-forth by the Court of Appeals for this Circuit in *United Coin Meter v. Seaboard Coastline RR.*, 705 F.2d 839 (6th Cir.1983), as follows:

1. Defaults are not favored since they run counter to the view of our system of jurisprudence that the interests of justice are best served when lawsuits are re-

solved on their merits after trial, *ib.*, 705 F.2d at 846[9].

2. Any doubt should be resolved in favor of setting-aside a default so that the case can be decided on its merits, *id.*

3. Whether the entry of a default should be set-aside is a matter committed to the discretion of the trial judge, but the exercise of that discretion entails a consideration of three factors:

 a. whether the default was the result of wilful conduct on the part of the defaulting-defendant;

 b. whether the plaintiff would be prejudiced if the entry of default were set-aside; and,

 c. whether the defendant has asserted a meritorious defense.

*Ib.*, 705 F.2d at 844.

4. Mere delay in satisfying a plaintiff's claim, if the latter should prevail at trial, is not sufficient prejudice to require denial of a motion to set-aside a default, *ib.*, 705 F.2d at 845[7].

5. In determining whether a defaulted-defendant has a meritorious defense, the likelihood of its success on such defense is not the measure; rather, if any defense relied upon states a defense good at law, then a meritorious defense has been advanced, *ib.*, 705 F.2d at 845[8].

6. Resolution of an action by default " * * * is a drastic step which should be resorted to only in the most extreme cases," *ib.*, 705 F.2d at 845[3].

The record herein does not demonstrate that Mr. Friedman's default was the result of his wilfulness. This is not a situation where a defendant has totally ignored the

---

**1.** "The procedural steps contemplated by the Federal Rules of Civil Procedure following a defendant's failure to plead or defend as required by the Rules begin with the entry of a default by the clerk upon a plaintiff's request. * * * " *Meehan v. Snow*, 652 F.2d 274, 276 (2d Cir.1981).

**2.** "Service of a summons and complaint may be accomplished by means of first-class mail, in accordance with Rule 4(c)(2)(C)(ii) of the *Federal Rules of Civil Procedure.* Such service shall not be the basis for entry of a judgment by

default, however, unless (1) an acknowledgment of service is filed with the court in accordance with Rule 4(g) of the *Federal Rules of Civil Procedure * * * .*" Local Rule 8(a)(5)(a); *see* form 18–A, F.R.Civ.P., App. of Forms.

**3.** The requirements of this provision of the Soldiers' and Sailors' Civil Relief Act of 1940 are mandatory and restrict the Court's power to render a default-judgment until they have been met. *See United States v. Simmons*, 508 F.Supp. 552 (D.C.Tenn.1980).

Court's process; instead, Mr. Friedman's failure to plead or otherwise defend in a timely fashion appears to have resulted from his notion that the service of process was legally insufficient because it was delivered by postal-authorities to his 14-year old son; shortly after he had received the process from his son, Mr. Friedman spoke with a deputy clerk of this Court and expressed to her his desire to defend herein and his contention that he had not been properly served with process.

The plaintiff does not claim he will suffer any prejudice if the entry of default is set-aside, and none is apparent to the Court. Requiring the plaintiff to prove his case on the merits, rather than winning by default, is not prejudicial.

Finally, the defaulted-defendant has set-forth in his answer numerous defenses which, if established at trial or otherwise, would bar any recovery by the plaintiff. Thus, Mr. Friedman has asserted a meritorious defense.

The Court does not in any way condone the failure of Mr. Friedman to have responded to the complaint within the time provided in the Federal Rules of Civil Procedure. If he believed service-of-process upon him was insufficient, then Mr. Friedman should have filed a timely motion to dismiss the action in accordance with the provisions of Rule 12(b)(5), F.R.Civ.P. Litigants who make private determinations of the law, and act (or omit to act) accordingly, assume generally the risk of the consequences in the event their determination proves incorrect. *See Maness v. Myers,* 419 U.S. 449, 458, 95 S.Ct. 584, 591[2], 42 L.Ed.2d 574 (1975) ("Persons who make private determinations of the law and refuse to obey an order generally risk criminal contempt even if the order is ultimately ruled incorrect.").

Nevertheless, the basic purpose of the Federal Rules of Civil Procedure is to administer justice through fair trials, and those Rules were designed in large part to depart from some of the old procedural booby-traps which prevented unsophisticated litigants from ever having their day in court and to guarantee, as nearly as possible, that lawsuits are decided on their merits. *Surowitz v. Hilton Hotels Corp.,* 383 U.S. 363, 373, 86 S.Ct. 845, 851[3–7], 15 L.Ed.2d 807 (1966). The built-in flexibility of the Rules reflect the enlightened view, that decisions on the merits should not be avoided on the basis of technicalities or one misstep by a litigant. *Foman v. Davis,* 371 U.S. 178, 181–182, 83 S.Ct. 227, 230[3], 9 L.Ed.2d 222 (1962).

It being the opinion of the Court that good cause exists for setting-aside the entry of default herein, the motion of the defendant Mr. Friedman hereby is GRANTED and the entry of default herein of November 9, 1984 hereby is

SET ASIDE. Rule 55(c), F.R.Civ.P.

## ON MOTION FOR LEAVE TO WITHDRAW

■ "Ordinarily counsel will not be allowed to withdraw if such withdrawal will delay the trial of the case." Local Rule 1(g). The Court is not satisfied that withdrawal of counsel for the defendant Mr. Friedman would not delay the trial of this action on September 19, 1985. Accordingly, the motion of such counsel for leave to withdraw hereby is

DENIED in the absence of the entry of an appearance by substitute-counsel or the assertion by Mr. Friedman of his right of self-representation, *see* 28 U.S.C. § 1654.

## ON MOTION TO DISMISS

On the second day of trial, the defendants moved the Court to dismiss this action for the failure of the plaintiff to have joined an "indispensible" party under Rule 19, F.R.Civ.P. Rule 12(b)(7), F.R.Civ.P.* In support of their motion, the defendants argue that the plaintiff should have joined Mobile Telephone of Middle Tennessee, Inc. (MTMT) as a party-defendant herein and,

---

* Neither defendant raised this defense by motion until prompted so to do by the Court, although had it been good, it would have been dispositive and rendered the present trial redundant.

that in the absence of such joinder, they will remain subject to a substantial risk of incurring double liability. Rule 19(a)(2)(ii), F.R.Civ.P.

The movants appear to fear that, hereafter, the plaintiff may attempt to bring another civil action against them seeking to recover from them (as agents of MTMT) under the promissory note involved herein. They overlook, however, the preclusive effect of the judgment that will be rendered in this action.

■ "Under res judicata, a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Allen v. McCurry,* 449 U.S. 90, 94, 101 S.Ct. 411, 414[2], 66 L.Ed.2d 308 (1980). Thus, where two successive lawsuits seek recovery for the same injury, a judgment on the merits operates to bar the later suit, even though a different legal theory of recovery is advanced in the second suit, *Cemer v. Marathon Oil Co.,* 583 F.2d 830, 832[6] (6th Cir.1978); the result is that a plaintiff must join in a single lawsuit all his rights to remedies against the defendant " 'with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose.' " *James v. Gerber Products Co.,* 587 F.2d 324, 328 n. 5 (6th Cir.1978), quoting *Restatement (Second) of Judgments,* § 48, comment a, at 36 (Tent. Draft no. 1, 1973).

■ Rule 19(a)(2)(ii), *supra,* " * * * requires a *substantial* [emphasis original] risk of double liability." *Morgan Guaran-* ty Trust Company of New York v. Martin, 466 F.2d 593, 598 (7th Cir.1972). The res-judicata effect of the final judgment to be entered herein negates any substantial risk that the defendants might be subjected to double liability.

The motion hereby is

DENIED.

### MEMORANDUM OPINION

This, *inter alia,* is a diversity action, 28 U.S.C. § 1332(a)(1), for damages brought by the plaintiff Mr. William P. Akers, of Tennessee, against each of the defendants Mrs. Shirley Bonifasi and Mr. Morris S. Friedman, both of Arizona, and both of whom were connected vocationally at the pertinent times with Mobile Telephone of America, Inc. (MTA). Trial was to the Court September 19–20, 23–24, 1985.*

Mrs. Bonifasi was the principal in another corporate entity operating in Arizona known as Racom which, *inter alia,* was a representative of General Electric Company (GE), the manufacturer of Marc V classic mobile (radio) telephones (MT). She was also the president and owner of (from 100% to 90% of) the shares of stock of MTA.

Racom bought MTs from GE and then sold them to MTA, each transaction resulting in a profit. Mrs. Bonifasi devised a plan to produce another profit through the creation of franchise operations in several cities of the Country in which MTA would own an interest, as well as selling MTs to each franchisee; she caused MTA to engage the services of her codefendant Mr.

---

* The motion of the plaintiff to amend his complaint post-trial so as to assert five additional claims for relief hereby is DENIED, such issues not having been tried by either the express or implied consent of the parties. Rule 15(b), F.R. Civ.P.; *MBI Motor Company, Inc. v. Lotus/East, Inc.,* 506 F.2d 709, 711[1, 2] (6th Cir.1974).

The motion of the plaintiff for leave to file the depositions of such defendants hereby is GRANTED. Local Rule 9(c)(1). However, such depositions are NOT admitted into evidence and have not been considered by the Court in reaching its decision herein. Rule 32(a)(3), F.R. Civ.P. "The deposition has always been, and still is, treated as a substitute, a second-best, not

to be used when the original is at hand." *Napier v. Bossard,* 102 F.2d 467, 469 (2d Cir.1939) (Learned Hand, J.). Both defendants were present at trial and the plaintiff could have used their live testimony. (Contrary to the expressed concern of the plaintiff, he would not have "vouched" for the credibility of a defendant by calling him or her as a witness. Rule 607, F.R.Evi.).

The motion of the defendants for leave to file the deposition of the plaintiff, his answers to their interrogatories, and his response to their request for admissions hereby is GRANTED. Local Rule 9(c)(1). Of course, such are NOT admitted into evidence.

Friedman to attract additional investors to operate the prospective franchises.

Mr. Friedman, with the approval of Mrs. Bonifasi as to its content, caused the insertion in an issue of *The Tennessean*, a daily newspaper published in Nashville, Tennessee, in August, 1983 of a display advertisement in its classified-advertising section as follows:

### GE MOBILE RADIO
EQUIPMENT

### INVESTMENT OPPORTUNITY
Mobile Telephone of America is seeking a partner to assist in expanding our rapidly growing facility in this area.
Sales experience helpful but not necessary. Administrative qualities are extremely important. No technical knowledge necessary.

### EXCEPTIONALLY HIGH EARNINGS FIRST YEAR
Full company training and complete marketing support for the qualified individual who can prove stability and integrity.

### PRIME LOCAL ADVERTISING
$90,000 minimum cash requirement—totally secured by inventory. You may telephone today through Wednesday for literature or appointment.

**1-800-331-1437**
**MR. KNIGHT**
**10805 N. 71st Way**
**Scottsdale, AZ 85254**

### RACOM/MOBILE TELEPHONE OF AMERICA

Mr. Akers was attracted by the Racom-MTA's said advertisement, having a highly favorable impression of electronic devices manufactured by GE which he deemed shared generally by the public-at-large. He had worked for others in the electronic field for many years during which he amassed sufficient savings as to be able to enter business in which he was a principal (as his initial venture personally into business).

Mr. Akers responded to the advertisement by making a call by telephone to "Mr. Knight" at the number listed therein. There was no "Mr. Knight", this name's being a "code" to alert telephone receptionists at MTA that such incoming telephone calls were responsive to this or a similar advertisement in some publication for franchisees; during that conversation on the telephone, Mr. Friedman identified himself as the recipient of the call from Mr. Akers.

Some three weeks after the foregoing telephone conversation between Messrs. Akers and Friedman, Ms. Judith Fletcher interviewed Mr. Akers in Nashville. As a result, Mr. Akers wrote MTA, addressing Mr. Friedman, on August 24, 1983 asking to be considered "for a joint business venture" with MTA in a franchise operation "in the Nashville, Tennessee area" and remitting to MTA by check of the next date $2,000 of the $90,000 included in such advertisement, to indicate his earnestness in pursuing the venture.

Mr. Friedman called Mr. Akers by telephone shortly thereafter and visited him in Nashville on September 9, 1983. Mr. Friedman explained to Mr. Akers that a corporation would be formed to operate the franchise contemplated, of which Mr. Akers would be president and Mrs. Bonifasi secretary. He described Mrs. Bonifasi to Mr. Akers as a very wealthy woman who owned both Racom and MTA; as the type of person who would not want anyone to lose an investment in one of her enterprises; and as one who would prevent any loss by Mr. Akers of his investment by buying back personally his interest in the projected franchise if necessary. He added that the $90,000 to be invested by Mr. Akers would be secured further by the inventories of MTs which the new corporation would have on hand, (although this means of further security was not explained farther).

It was explained farther by Mr. Friedman, however, that the contemplated franchise would sell MTs to subscribers, from which sales the new corporation would earn a profit, and that its users would pay in addition for the time each MT of a subscriber was actively being utilized "on the air," and that such "air-time" revenues would be continuing sources of income to the new corporation.

As Mr. Friedman was departing from the company of Mr. Akers, he left with the latter a pretyped letter of September 9,

1983 of MTA, notifying him "officially" that he was the recipient of the opportunity to join the franchise venture in Nashville "by unanimous decision by the Board of Directors" of MTA. Enclosed therewith were a pre-incorporation agreement, shareholders' agreement, and an employment agreement, all which Mr. Akers was instructed to execute and return to MTA by September 21, 1983 with a cashier's check for $8,000 "representing the balance of your initial deposit." *Inter alia*, the letter stated:

\*　\*　\*　\*　\*　\*

The remaining $80,000 [after payment of the first $2,000 and the requested $8,000] is representative of the balance for the purchase of forty (40) G.E. Marc V mobile phone units at a cost of $2,000 each, plus $10,000 for engineering. The procedure is that [MTA] will form a Tennessee corporation with you * * *. You will be making a loan to that [Tennessee] corporation in the amount of $90,000.00. I have enclosed a sample Note, which will be signed and executed by you as President of the new corporation. At the time the corporation is formed, * * * you [will] make a check to the corporation in the amount of $200 for your stock purchase.

* * * If you wish to make any changes * * *, they should be made on the same line [of the three documents enclosed]. * * * If for any reason we [can] not agree on the terms, then we would immediately and forthwith return your $8,000 deposit and consider the transaction null and void.

* * * Once again for clarification purposes, the total aggregate amount of $90,000.00 represents an inventory of forty (40) G.E. Marc V mobile telephones at $2,000 each, and $10,000 for engineering.

\*　\*　\*　\*　\*　\*

* * * As set forth in the [*sic:* proposed] agreements, there are many contractual obligations and stipulations, but *the most important one is not there*, and that is [MTA's] moral obligation to be the type

of leader, security blanket, and foundation to build a viable business * * *. [Emphasis supplied by this writer.]

Such pre-incorporation and stockholders' agreements provided that 500 shares of the stock of the new corporation would be issued to Mr. Akers and MTA, each; that the new corporation would be named Mobile Telephone of Middle Tennessee (MTofMT); and that the respective shareholders would vote their shares so as to enter into an employment agreement between MTofMT and Mr. Akers "in the form attached hereto." Such attached form thereof provided for fixed compensation of Mr. Akers as president of MTofMT as "an annual draw and/or salary of Thirty-Five Thousand and No/100 Dollars ($35,000.00)." The first above mentioned agreement provided also *inter alia* that Mr. Akers would lend MTofMT $90,000 to be "used for the purpose of purchasing 40 GE MARC V mobile telephones" from MTA at $2,000, each, "plus $10,000 for engineering," and that MTA would "provide necessary working capital to the Corporation [MTofMT]."

Mr. Akers signed each of the foregoing documents on September 21, 1983 as directed, and returned them to Mr. Friedman with his check payable to the order of MTA in the amount of $8,000. 'Ere long, Mr. Friedman called him and said *inter alia* that Ms. Bonifasi was unwilling for MTofMT to pay Mr. Akers the agreed annual compensation of $35,000 and had changed the foregoing allotment of shares of stock to 350 for Mr. Akers and 650 for MTA. Mr. Friedman sent Mr. Akers the modified agreements on September 28, 1983 and urged him to acquire office space expeditiously.

Mr. Akers arranged for same and sent lease forms therefor to MTA on October 17, 1983. He requested that MTA send, as an operating expense, a deposit of $1,070 to the landlord so walls could be constructed in the leased space and carpeting and lighting could be installed.

On October 1, 1983, Mr. Friedman advised Mr. Akers that the GE equipment

required for operation of the MTs would be operational "in about a month" and indicated there would be no delay in installation thereof as MTA was "the exclusive agent of GE" for such purposes. He requested that Mr. Akers send MTA $40,000 for an inventory of MTs for MTofMT to sell and an additional $350 in payment of his 350 shares of stock therein, promising that the MTs would be shipped when payment therefor was received by MTA.

Mr. Akers sent MTA (through Mr. Friedman) the requested amounts of $40,000 and $350 on October 10, 1983 by check for that aggregate amount. Mr. Friedman advised Mr. Akers not to use the GE "logo" on any of the materials prepared for MTofMT, and the MTA administration manual he received stated flatly: "The use of the General Electric LOGO is *not* permitted." Thus, for the first time, Mr. Akers became aware that the new franchisee could not use the fact that GE was the brand of MTs offered the public by MTofMT. Mrs. Bonifasi (for MTA) returned the office-space lease to Mr. Akers and the deposit of $1,070 asked for on October 24, 1983.

MTofMT had installed in its facility an ITT telephone system on a lease-purchase arrangement with I & R Lending, Inc. at a total cost of $2,966.33, acquired office furniture, state and county licenses, and miscellaneous items. Mr. Akers advanced personally the cash-outlay necessary for the acquisition of these items. Afterward, he discovered Mr. Friedman had not caused the incorporation of MTofMT, as he had promised Mr. Akers he would, and MTA did not immediately reimburse him for his out-of-pocket expenses, as agreed.

With an investment now in the cash amount of $50,350 in the franchise, and the set-up still unoperational, Mr. Akers inquired of Mr. Friedman concerning the personal guaranty of his investment by Mrs. Bonifasi. He expected, on the basis of assurances of Mr. Friedman, that he would have received such a guaranty with the other documents delivered to him by Mr. Friedman on September 9, 1983; however, this document was in the form of an unexecuted note in that amount payable to Mr. Akers, ostensibly to be signed (perhaps, for MTofMT) by Mr. Akers, as its president, and Mrs. Bonifasi, as its secretary. No guaranty by Mrs. Bonifasi was ever received by Mr. Akers.

Mr. Friedman's response to Mr. Akers was that the former was coming to Nashville "to talk with GE" and that all problems would be discussed at that time. Upon Mr. Friedman's arrival, he talked from the office of MTofMT with someone on the telephone; after which he advised Mr. Akers that MTA would be "using Mr. Cleaver's license in Nashville" for operation of the equipment of the franchise. Mr. Friedman appeared to Mr. Akers to be in a great hurry and explained that he was rushing to a meeting "with other investors" in Kansas City, Missouri and asked Mr. Akers to accompany him or come there the next morning. Mr. Akers made the trip, leaving November 1, 1983.

Upon his return to Nashville, Mr. Akers received Mr. Friedman's letter of November 4, 1983 in which the latter stated that, after lengthy discussion with Mrs. Bonifasi, the franchise transaction was to be changed as follows: $50,000 paid MTA by Mr. Akers would be applied to the purchase by MTofMT of 20 MTs ($40,000) and ($10,000) to "engineering"; Mr. Akers would own 60% and MTA 40% of the shares of stock of MTofMT, although MTA would elect two directors to Mr. Akers' one of its board of directors; Mr. Akers would be president and chief executive officer of the corporation, his "salary will be as agreed," and Mrs. Bonifasi would be its secretary. MTofMT would buy a complete interconnect radio-telephone system, but Mr. Akers would be responsible for the "complete financing" of it which would be installed by MTA on the transmitting equipment "owned by the Manufacturers Representative," (obviously Racom), and such equipment "should be installed * * * within thirty (30) days after receiving the executed documents" from Mr. Akers, as: "'We have them in stock.'" The estimated cost

of such installation "and all equipment" was between $35,000 and $40,000.

MTofMT would repay MTA for "any and all expenses incurred by [MTA] in 'training and hiring' all sales personnel and any related endeavors" and purchase of any more MTs from MTA "on their standard thirteen (13) day terms." The proposal then would have provided incongruously:

In the event (1) any of the warranties and representations made by the Shareholders [sic] in the Agreement executed by Akers and the Shareholder [sic] are or become untrue, (2) Bill Akers is terminated as President of the [MTofMT] Corporation, or (3) the parties fail to agree on any fundamental change, and such disagreement continues for more than fifteen (15) days, Stockholder [sic] shall offer to purchase any stock owned by Akers or his immediate family members at a price equal to the greater of the book value of that stock or the fair market value, as determined after an appraisal and in accordance with generally accepted accounting principles, consistently applied, by a team of accountants consisting of one accountant appointed by each shareholder of the Corporation [MTofMT].

At that time, Mr. Akers had received no mobile-telephone units from anyone despite his payment to MTA of $50,350. He advised MTA (through Mr. Friedman) on November 8, 1983 that he rejected the new proposal and insisted on the continuance of the original agreement of the parties.

He admonished the other parties not to "load me up with inventory which I could not dispose of if you did withdraw support" from the franchise and requested that his $50,350 in deposits continue to be held, in cash, "until such time as you decide to give full and enthusiastic support to our venture or until you refund them [such deposits] to me. I could be persuaded to relinquish my share of [MTofMT] by a complete refund of the $50,350.00."

Mr. Akers received no timely response from MTA, Mr. Friedman or Mrs. Bonifasi and mentioned that he might return to college. Mr. Friedman then urged Mr. Akers by telephone conversation not to return to college; asked for a meeting of the two men; observed that it would be an inconvenience if they "quit" the franchise; and that Mr. Akers could not "get security" of the inventory until MTofMT received the inventory.

Messrs. Akers and Friedman met on December 9, 1983, at which time Mr. Friedman stated the MTs were being forwarded to MTofMT, and that it would be appropriate for Mr. Akers to pay more of the remainder of the $90,000 implicated. Mr. Friedman delivered to Mr. Akers MTA's check for $5,000 "representing the initial deposit and the first loan to MTofMT" expressing "our hope to be completely functional and on line within the next thirty days" and taking occasion to "apologize on behalf of [MTA] and it's [sic] president, Shirley Bonifasi for either any inconsistency or difficulties that we may have caused you." Mr. Akers delivered to Mr. Friedman at that time his (Mr. Akers') check for $20,000 payable to the order of MTA "for Dist./Inventory."

Mr. Akers was much encouraged when MTA provided him on January 30, 1984 with a model for an advertisement to be inserted, seeking sales personnel for MTofMT who, for a commission, would "sell our prestigious car telephone, as well as, other fine General Electric products to the affluent." He received under the same date an "explanation" of MTA, through Mr. Friedman, of the problem which had contributed to the inability of MTA to provide timely facilities for radio-telephone service to prospective purchasers of MTs from MTofMT:

The transmission-equipment involved required certain crystals. MTA had a set of crystals in Florida and caused them to be transported to Nashville for use in GE transmission-equipment. The crystals received from Florida were of the Motorola brand and could not be utilized on the GE-equipment in Nashville. Mr. Friedman explained: I personally had all of the equipment hand delivered so that we would be

on line by the end of the month [of January, 1984]. * * * [M]y gut feeling is that we wait until maybe the 20th of February and hope that he [Mr. Cleaver] has secured crystals and [that] we [will have] got[ten] some type of green light from the F.C.C."

While awaiting the resolution of the mechanical difficulties, Mr. Akers attended a training session in Dallas, Texas, amid his complaints to Mr. Friedman that he (Mr. Akers) was continuing to advance his own money for such matters and to pay his living expenses and yet was not receiving the salary promised him as head of MTofMT. He discovered in Dallas that, whereas MTofMT was planning to sell MTs for an aggregate of some $4,400 (including tax and installation charges), the same MTs were being sold in Dallas for $2,995 plus tax and such charges. He discovered also that MTA did not bill its franchisees for MTs but that Racom would bill MTofMT for them via computer, of which MTofMT would realize only some 35% of the purchase price.

Mr. Akers was called from Racom in early February, 1984 by a son of Mrs. Bonifasi; and, on February 15, 1984 (after receiving the shock of a disturbing rumor), Mr. Akers called the manager of the franchise-operation in Dallas and inquired of him concerning a rumor that both MTA and Racom were in serious financial difficulty. As a result of that call, on February 20, 1984, Mr. Akers stopped payment on his check of December 9, 1983 to MTA for $20,000.

This was after he had inquired also of Mr. Friedman on February 17, 1984 and was assured that neither MTA nor Racom was in financial trouble and no bankruptcy-proceedings were in prospect against either of them and promised to send MTofMT some $2,000 to pay incoming operational statements of account. Assurance was given Mr. Akers also by Mr. Friedman that the remainder of the inventory of MTs was being shipped to MTofMT and that the transmission equipment would be "up and operational," and that MTA had not negotiated Mr. Akers' most recent check for $20,-000. This was also after Mr. Akers had talked with Mrs. Bonifasi on February 19, 1984 and received her assurance that her operations were experiencing no financial problems.

Ten days afterward, on February 29, 1984, Mr. Akers learned that MTA and Raycom were indeed in financial straits and that MTA had instituted bankruptcy-proceedings on the preceding February 9, 1984, and Racom had done likewise about the same date.

Mr. Akers reached Mrs. Bonifasi by telephone again on March 13, 1984 and was advised by her that the MTofMT franchise could not be continued; that her operations were unable to pay back Mr. Akers' $90,-000; and that the bankruptcy laws prevented her sending to him or MTofMT any more telephones. (Between his two conversations with Mrs. Bonifasi, Mr. Akers learned that his stop-payment order had not been honored by his bank, but somehow he was given eventually credit for such amount of $20,000.) At this juncture, Mr. Akers shut-down the franchise operation of MTofMT, salvaged what he could, and got himself a job working for someone else.

Mr. Akers claims rights to recovery from Mr. Friedman and Mrs. Bonifasi under five different theories:

## I

Mr. Akers claims the defendants violated regulations of the Federal Trade Commission (FTC) in failing to provide him with a disclosure statement or prospectus governing the sale of franchises, and that, as a consequence, he has a private right-of-action against them under the FTC Act, 15 U.S.C. §§ 45, et seq. Private litigants, such as Mr. Akers, cannot invoke the jurisdiction of a federal district court on such an allegation, the exclusive remedial-power in such instances having been invested by the Congress in the FTC. *Baum v. Great Western Cities, Inc. of New Mexico,* 703 F.2d 1197, 1209[12] (10th Cir.1983); *Dreisbach v. Murphy,* 658 F.2d 720, 730 (9th Cir.1981); *Fulton v. Hecht,* 580 F.2d 1243,

1249, n. 2[5] (5th Cir.1978); *Alfred Dunhill Limited v. Interstate Cigar Company, Inc.,* 499 F.2d 232, 237[3] (2d Cir.1974); *Holloway v. Bristol-Myers Corporation,* 485 F.2d 986, 988–992[1] (D.C.Cir.1973); *contra: Guernsey v. Rich Plan of the Midwest,* 408 F.Supp. 582 (D.C.Ind.1976). This claim is insufficient as a matter of law.

## II

■ Two of the claims of Mr. Akers seek recovery under provisions of the Securities Act of 1933. His claim under 15 U.S.C. § 77e must fail because any sale of securities by the defendants to Mr. Akers involved a non-public offering which was exempt from registration by virtue of 15 U.S.C. § 77d(2). *Chapman v. Dunn,* 414 F.2d 153, 159 (6th Cir.1969).

■ Neither is the Court persuaded that Mr. Akers is entitled to pursue his claim under 15 U.S.C. § 77q(a): Whether such statute affords a private remedy to one injured by its breach " * * * is the subject of substantial dispute and on which the circuits are split." *Cleary v. Perfectune, Inc.,* 700 F.2d 774, 779 (1st Cir.1983). The Supreme Court has reserved decision on the issue, *Herman & McLean v. Huddleston,* 459 U.S. 375, 378 n. 2, 103 S.Ct. 683, 685 n. 2, 74 L.Ed.2d 548 (1983), and the Sixth Circuit has not addressed it; in the absence of further guidance from either of those courts, this Court will follow the well-reasoned holding of the Fifth Circuit, that such a private remedy does not exist. *Landry v. All American Assur. Co.,* 688 F.2d 381, 384–391 (5th Cir.1982).

## III

■ The claim of Mr. Akers that the defendants are liable to him under the provisions of 18 U.S.C. § 1964 (c) was not supported by the evidence; he offered insufficient evidence of a pattern of racketeering activity by either defendant by way of mail-fraud under 18 U.S.C. § 1341 or wire-fraud under 18 U.S.C. § 1343, as he had alleged. He could have prevailed on this theory only by having proved *inter alia* the conducting by a defendant of an enterprise through a pattern of racketeering activity. *Sedima, S.P.R.L. v. Impex Co., Inc.,* —— U.S. ——, ——, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985).

## IV

The remaining claim of Mr. Akers is that the defendants committed unfair and deceptive acts against him in violation of the Consumer Protection Act of 1977, T.C.A. §§ 47–18–101, et seq., for which he is entitled to his actual damages, T.C.A. § 47–18–109(a)(1), and his reasonable attorney's fee, T.C.A. § 47–18–109(e)(1); and, because such violation(s) was or were wilful on the part of the defendants, his actual damages should be trebled. "The Tennessee Consumer Protection Act declares unlawful any 'unfair or deceptive act or practices affecting the conduct of any trade or commerce.' T.C.A. § 47–18–104. * * * [T]he concept of 'deceptive' carries with it an element of intent * * *." *Groover v. Torkell,* 645 S.W.2d 403, 409 (Tenn.App.1982), *permis.app.den.* by S.Ct.Tenn. (1982).

"The Act is to be liberally construed to protect consumers and others from those who engage in deceptive act[s] or practices. T.C.A. § 47–18–102(b). * * *" *Haverlah v. Memphis Aviation, Inc.,* 674 S.W.2d 297, 305[11] (Tenn.App.1984), *permis.app.den.* by S.Ct. of Tenn. (1984). "T.C.A. § 47–18–109 confers a private right-of-action on an individual who suffers an ascertainable loss as a result of an unlawful practice under the Act. A plaintiff's recovery is normally limited to actual damages and reasonable attorney's fees, but if the violation was willful and knowing, the court may award treble damages." *Brungard v. Caprice Records, Inc.,* 608 S.W.2d 585, 591 (Tenn. App.1980), *cert.den.* by S.Ct. of Tenn. (1980).

Among the unfair or deceptive acts or practices affecting the conduct of trade or commerce, declared to be unlawful and in violation of Tennessee law, are included: the falsely passing off of goods as those of another; causing likelihood of confusion or

of misunderstanding as to the source, sponsorship, or approval of goods; causing likelihood of confusion or misunderstanding as to affiliation, or association with, or certification by, another; representing that goods have sponsorship, approval, or characteristics they do not have or that a person has a sponsorship affiliation or connection that he does not have; representing that goods are of a particular style or model, if they are of another; advertising goods with intent not to sell them as advertised; and representing that a consumer transaction confers or involves rights * * * [or] remedies that it does not have." T.C.A. §§ 47–18–104(b)(1)–(3), inclusive, (5), (7), (9), (12). "Consumer" is defined in the Act *inter alia* as " * * * any person who purchases * * * a franchise * * * agreement or any similar type of business opportunity." T.C.A. § 47–18–103(1). "Goods" are defined therein to include " * * * a franchise * * * or similar business opportunity." T.C.A. § 47–18–103(4).

The established policies of the state of Tennessee include its legislative efforts to protect legitimate business-enterprises from those who engage in unfair or deceptive acts or practices in the conduct of trade or commerce in part or wholly within Tennessee and to declare and provide for civil means of maintaining ethical standards of dealing between persons engaged in business, to the end that good-faith dealings between buyers and sellers at all levels be had in this state. T.C.A. §§ 47–18–102(2),(4). This Court hereby

■ FINDS that each of the defendants, Mrs. Bonifasi and Mr. Friedman, infringed those policies and committed unfair and deceptive acts by advertising for franchisees of GE Mobile Radio equipment through Racom and MTA and promising exceptionally high earnings in the first year of operation of the franchise, when the offering of GE units, as such, was prohibited and the first year of the life of the franchise produced losses rather than earnings. This Court FINDS further that the defendant Mr. Friedman engaged also in another act which was deceptive to Mr.

Akers, by promising him that the codefendant Mrs. Bonifasi would provide him with a guaranty personally against any loss of money he invested in MTofMT when there was no evidence that she had ever agreed to do so.

■ As a proximate result of such unlawful acts by the defendants, the plaintiff Mr. Akers sustained actual damage of $70,350. In Tennessee, "willful" means nothing more than intentional. *Kite v. Hamblen*, 192 Tenn. 643, 241 S.W.2d 601, 603[2] (1951). Here, "knowingly" means actual knowledge of a falsity or deception, " * * * but actual awareness may be inferred where objective manifestations indicate that a reasonable person would have known of the falsity or deception, * * * " T.C.A. § 47–18–103(5).

■ This Court FINDS that the commissions of the unfair and deceptive acts of each of the defendants, Mrs. Bonifasi and Mr. Friedman, were both wilful and knowing and, having considered the criteria specified in T.C.A. § 47–18–109(a)(4), awards the plaintiff Mr. Akers three times the actual damages he sustained as a proximate result of such acts, T.C.A. § 47–18–109(a)(3), *supra*.

## DECISION

The plaintiff Mr. William P. Akers shall recover of each of the defendants Mrs. Shirley Bonifasi and Mr. Morris Friedman damages in the sum of $211,950, and his reasonable attorney's fee. It is

ORDERED that the clerk *not* prepare, sign and enter judgment until further directed so to do. Rule 58(1), F.R.Civ.P.

As the plaintiff offered at trial no evidence as to the amount of a reasonable attorney's fee herein, the parties will undertake to agree within 30 days herefrom on a proper amount thereof and so stipulate such fact; if such an agreement is not made within the time thus allowed, each respective party shall submit to the Court through the clerk within that period a stipulation as to the full facts each witness to

be called by such party on such issue would testify for consideration by the Court.