517 So.2d 397 (1987)
EXPRESSWAY TEXACO SERVICE, INC.
v.
Helen Pitre, Wife of/and Anthony E. ORGERON (a/k/a Tony P. Orgeron) and Helen Ann Orgeron.
No. 87-CA-362.
Court of Appeal of Louisiana, Fifth Circuit.
December 8, 1987.
*398 Jon A. Gegenheimer, Gretna, for appellants/ defendants.
Before KLIEBERT, WICKER and GOTHARD, JJ.
WICKER, Judge.
This appeal arises from a suit filed on behalf of Expressway Texaco Service, Inc. (Expressway), plaintiff/appellee against defendants/appellants Helen Pitre (Pitre), Anthony E. Orgeron (a/k/a Tony P. Orgeron) (Orgeron), and Helen Ann Orgeron (Helen) in which Expressway seeks damages for breach of a service station lease agreement. The defendants/appellants filed a third party demand against Texaco, Inc. (Texaco) and Expressway. The trial judge rendered judgment in favor of Expressway and against Pitre, Orgeron and Helen in the sum of $3,499.00 and dismissed the third party demand. The Orgerons now appeal. We revise in part and as revised affirm; we recognize the automatic 11 U.S.C. § 362(a) stay as it applies to Texaco.
On January 30, 1970 Oregon and Pitre, owners/lessors[1] of certain immovable property in Jefferson Parish, entered into a lease agreement with Texaco, the lessee. The lease involved a service station facility. The agreement expressly provides for a maintenance provision as follows:
(4)(a) During the term of this lease, lessee shall at lessee's expense make minor repairs to said premises, buildings and improvements, including repairs to plumbing, heating equipment, electrical wiring and fixtures, and replace broken windows, provided the aggregate cost of all repairs and/or replacement of windows required at any one time does not exceed $50.00. Lessee agrees to paint the buildings and improvements whenever it deems such painting necessary. [emphasis supplied]
(4)(b) Lessor agrees at lessor's expense to make all other repairs to the said premises, buildings and improvements, equipment and fixtures furnished by lessor, and to keep the same in good repair during the term of this lease, as well as to replace any equipment furnished by lessor which becomes worn-out or damaged and cannot in the opinion of lessee, be placed in first-class condition by reasonable repairs. In event lessor shall fail promptly to make repairs or replacements as provided for herein, lessee is authorized to make the necessary repairs or replacements and to apply accruing rentals to reimburse itself for such expenditures. Lessor agrees to obtain endorsement *399 of all fire insurance policies covering the premises waiving the insurer's subrogation rights against lessee and its sublessees. [emphasis supplied]
On October 28, 1982 Texaco assigned its rights under the January 30, 1970 lease[2] to Warbert R. Schneider (Schneider) effective November 1, 1982. Later, Schneider assigned his rights to the lease to Expressway, a company in which he is president and shareholder.
Schneider operated the station from 1970-1982 as Texaco's sublessee. From 1982 to the date of trial he operated the station subsequent to the assignments.
In 1985 Schneider informed the owners/lessors of a cracked and sinking concrete drive and requested that they repair the condition. When the owners/lessors failed to comply with his request, he filed suit against Helen and the Orgerons. The defendants contend that the deterioration of the concrete was caused by "improper and negligent workmanship" by Expressway and/or Texaco in 1981. In particular, they allege that no reinforced concrete was used in 1981 for the repairs undertaken at that time. Defendants filed a third party demand against Expressway and Texaco in connection with these allegations.
The trial court awarded the stipulated cost of repairs in the amount of $3,499.00 to Expressway and dismissed the third party demand filed by defendants.
Defendants/appellants now specify the following errors:
1. That the trial judge erred by misinterpreting subsection (4)(b) of the lease in concluding that the lessor is responsible for repairs, and
2. That the trial judge's conclusion that there was "no evidence whatsoever to indicate that some other third party or that lessee himself is responsible for in any way causing the damaged area."
11 U.S.C. § 362(a) AND THIRD PARTY DEFENDANT TEXACO:
At the outset we note that Texaco has filed a "voluntary petition for relief under Chapter 11, title 11, United States Code" on April 12, 1987, in case number 87B20142 in United States District Court for the Southern District of New York.[3] 11 U.S.C. § 362(a) provides for an automatic stay as follows:
Except as provided in subsection (b) of this section, a petition filed under sections 301, 302, or 303 of this title ... operates as a stay applicable to all entities, of(1) the commencement or continuation, including the issuance or continuation, including the issuance or employment of process, or a judicial, administrative, or other proceeding against the debtor that was or could have commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title ... [emphasis supplied]
However, while a chapter 11 proceeding will operate to stay the commencement of this appeal as to Texaco, the third party defendant, it does not stay proceedings as to the other parties. 11 U.S.C. § 362(a); Wedgeworth v. Fibreboard Corp., 706 F.2d 541 (5th Cir.1983); Pitts v. Unarco Industries, Inc., 698 F.2d 313 (7th Cir.1983), cert. denied 464 U.S. 1003, 104 S.Ct. 509, 78 L.Ed.2d 698 (1983); Fortier v. Dona Anna Plaza Partners, 747 F.2d 1324 *400 (10th Cir.1984); Akers v. Bonifasi, 629 F.Supp. 1212 (M.D.Tenn.1984).
Therefore, this court recognizes the 11 U.S.C. § 362(a) automatic stay as it applies to proceedings against Texaco, the third party defendant and we will take no further action relative to Texaco until authorized to do so by the bankruptcy court. Assoc. of St. Croix Condominium Owners v. St. Croix Hotel Corp., 682 F.2d 446 (3rd Cir.1982); Clark Oil Company, Inc. v. Martin Exploration Co., 494 So.2d 1186 (La.App. 1st Cir.1983).
MAINTENANCE PROVISIONS IN LEASE:
The Orgerons contend that the portion of slab which failed was not furnished by them. Instead, it was an "improvement" furnished by a third party. Consequently, the Orgerons assert that the trial judge should have interpreted (4)(b) to mean that they as lessors were responsible only for repairs to "improvements ... furnished by lessors."
We are not persuaded by appellants' argument that the concrete portion described is an "improvement" furnished by a third party.
The pertinent codal provisions are as follows:
1. L.S.A.-C.C. Art. 2692 which states in part:
The lessor is bound from the very nature of the contract, and without any clause to that effect:

* * * * * *
2. To maintain the thing in a condition such as to serve for the use for which it is hired.
2. L.S.A.-C.C. Art. 2693 states:
The lessor is bound to deliver the thing in good condition, and free from any repairs. He ought to make, during the continuance of the lease, all the repairs which may accidentally become necessary; except those which the tenant is bound to make, as hereafter directed.
3. L.S.A.-C.C. Art. 2694 states:
If the lessor do not make the necessary repairs in the manner required in the preceeding article, the lessee may call on him to make them. If he refuse or neglect to make them, the lessee may himself cause them to be made, and deduct the price from the rent due, on proving that the repairs were indispensable, and that the price which he has paid was just and reasonable.
In this case, the lease contract provision (4)(b) does not derogate from the codal provisions. Schneider's uncontradicted testimony is that the deterioration of the concrete is a dangerous condition which could ultimately result in gasoline leakage. Therefore, this condition interferes with the use of the facility as a service station. Clearly the lessor's obligation is to maintain the service station facility in a "condition such as to serve for the use for which it is [leased]." L.S.A.-C.C. Art. 2692(2).
Furthermore, "[i]t is elementary that in disputes arising under a contract of lease, said contract must be considered as the law of the case [citations omitted.] Dikert v. Ruiz, 231 So.2d 633, 634 (La.App. 4th Cir. 1970). The parties disagree as to who bears the responsibility for repairs of the failed concrete. The relevant portions of the lease are noted herein.
Provision (4)(b) places the responsibility on the lessor for "all other repairs to the said premises" which are not included in (4)(a), the provision dealing with "minor repairs" which are the responsibility of the lessee. We find that premises necessarily includes the concrete portion in disrepair.
The lessors were notified of the condition. Although Orgeron asked Louis W. Stall (Stall), an expert in the area of residential and commercial construction and in the area of pouring of concrete slabs, to give an estimate for the repairs, Orgeron failed to authorize the repairs, contending that he was not responsible for payment. Furthermore, the need for repairs was stipulated to at trial by all parties.
Since the lessor failed to repair as required by the lease, lessee's remedy as provided for by the lease is that Expressway is "authorized to make the necessary repairs or replacements and to apply accruing *401 rentals to reimburse itself for such expenditures." [Lease provision (4)(b)]
Instead of authorizing Expressway to make the necessary repairs and then to apply accruing rentals for reimbursement, the trial court awarded a money judgment to Expressway in the amount of the stipulated cost for the repairs. We therefore conclude that the trial court erred in this regard.
MANIFEST ERROR:
Appellants argue that the trial court erred in finding no evidence that a third party was responsible for the damage. We disagree.
The testimony at trial set out the following: Orgeron testified that the service station operation began in 1960 or 1961. He initially operated the station for approximately one year. George Estes subsequently operated it prior to Schneider. Orgeron witnessed the original pouring of the slab which consisted of pouring over highway mesh and steel rods. He has undertaken no repair work since the original pouring. He knew that Helen did not do any work on the slab because she would have contacted him prior to doing so.
Orgeron was first aware of the problem with the slab when Schneider called him in 1985. He was also aware that Schneider wrote letters to Helen concerning the problem.
After he spoke to Schneider he asked Stall to visit the premises.
At trial, Orgeron admitted that he was not an expert in the pouring of concrete but nevertheless proceeded to speculate that whenever the concrete was cut in order to get to the pump isle, the original strength of the concrete was destroyed. Additionally, he did not know whether Schneider or Estes had the area cut. He did state, however, that the area was not cut while he had the operation. Moreover, he had no knowledge that anyone cut or repaired the slab. He speculated that Texaco had to cut the concrete.
Schneider testified that he has been at the station since 1970. The only repairs that he can recall is repair to the storage tanks in approximately 1977. The tanks are underground and the area is approximately ten feet away from that which is deteriorating. Orgeron never made any repairs to the station.
Schneider specifically noted that Texaco had the underground tanks fiberglassed in another area approximately seven to ten feet away.
Schneider called Mr. R.C. Williams to give an estimate of the repair work. The parties stipulated that the amount of the repair work would be $3,499.29.
Stall testified that he visited the site in November 1985 after being called by Orgeron to give Orgeron a price to replace some concrete that failed. He also looked at the area again on the date of trial, February 20, 1987.
Stall told Orgeron that if he (Stall) corrected it, in three to six months the area would return to its present deteriorated condition. He suggested that "if [Orgeron] took an area approximately 20 by 20 and removed all of the concrete and then dialed into the other portion of the parking lot that remained, dial in with steel and then use highway mesh and then pour it as a monolithic type slab, then it would hold."
Stall stated that the area in question was in disrepair and needed to be repaired. The parties stipulated that this was so.
Stall further testified that the reason for the failure was "that the concrete was cut, either with hammers, a saw, or something... and then additional concrete was poured into those areas. [The new concrete] wasn't tied into the existing slab with steel ... it is just sitting by itself ... The heavy trucks that are rolling on there [c]aused it to settle."
Stall was positive that some repair work was done in the deteriorating area which led to its present condition. He could not tell when this had been done.
He testified that the area which Texaco admitted it did repair work was not a problem area. The area of repair Texaco admitted to is approximately 25-30 feet from the deteriorating area. He stated that he believed *402 that if heavy traffic and heavy trucks rolled over the area repaired by Texaco that it too would be deteriorated as well.
Emmet E. Arsenaux also testified. He is a field maintenance supervisor for Texaco. He testified that Texaco fiberglassed the underground tanks in the 1980's and that this was the only work Texaco did that he was aware of from 1977 to 1987. The area Texaco did the work in was eight to eighteen feet away from that area in question. He could only testify regarding 1977 to the date of trial.
Considering the record, we find that the trial court's conclusion that there is no evidence to show that a third person is responsible for the damaged area is amply supported. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). The lease provisions establish that the Orgerons are responsible for these repairs. L.S.A.-C.C. Arts. 2692, 2693, 2694 and Dikert, supra.

ORDER
ACCORDINGLY, WE RECOGNIZE the stay order pursuant to 11 U.S.C. § 362(a) as it applies to TEXACO, INC. and take no further action in the third party proceeding filed on behalf of HELEN PITRE, WIFE OF/ AND ANTHONY E. ORGERON (a/k/a TONY P. ORGERON) against TEXACO, INC. until authorized to do so by the Bankruptcy Court.
FURTHERMORE, finding that the trial court erred in awarding EXPRESSWAY TEXACO SERVICE, INC. money damages, WE REVISE the portion of the judgment which reads: "IT IS ORDERED, ADJUDGED AND DECREED that there be judgment herein in favor of plaintiff, EXPRESSWAY TEXACO SERVICE, INC., and against defendants, HELEN PITRE, wife of/and ANTHONY E. ORGERON (a/k/a TONY P. ORGERON) and HELEN ANN ORGERON, in the full and true sum of THREE THOUSAND FOUR HUNDRED NINETY-NINE AND NO/100 ($3,499.00) DOLLARS, with legal interest thereon from the date of judicial demand until paid" to now read:
IT IS ORDERED, ADJUDGED AND DECREED that EXPRESSWAY TEXACO SERVICE, INC. be and is hereby authorized to make the stipulated repairs in the amount of THREE THOUSAND FOUR HUNDRED NINETY-NINE AND NO/100 ($3,499.29)[4] DOLLARS and to apply accruing rentals to reimburse itself for this expenditure.
We affirm the dismissal of the Orgeron's third party demand as it applies to EXPRESSWAY TEXACO, INC.
IT IS FURTHER ORDERED that the Clerk of this court is directed to transmit a certified copy of this opinion and order to Judge H. Schwartzbergo, United States Bankruptcy Judge, Bankruptcy Court Unit, United States District Court, Southern District of New York, 101 East Post Road, Room 10, White Plains, New York 10601.
REVISED AND AS REVISED AFFIRMED; 11 U.S.C. § 362(a) AUTOMATIC STAY RECOGNIZED AS IT APPLIES TO THIRD PARTY DEFENDANT, TEXACO, INC.
NOTES
[1] The Orgerons admit in answer to the petition that on December 10, 1984, their daughter, Helen, acquired a one-half undivided interest in the property by act of donation.
[2] The assignment refers to the January 20, 1970 lease between the parties. Evidently there is a typographical error on the assignment since only a January 30, 1970 lease is in evidence. Moreover, the parties only refer to a January 30, 1970 lease.
[3] On May 27, 1987 a letter from counsel for Texaco, Inc. was filed in the proceeding pending before this court. In his letter counsel requested that we "amend [our] records to reflect that Texaco, Inc. cannot be made a party to the appeal." Counsel argued that since Texaco was "currently under the protection of Chapter 11 of the U.S. Bankruptcy Code [a]n automatic stay [had] been filed."

We construe his letter as a motion to recognize the automatic stay pursuant to 11 U.S.C. § 362(a). Subsequently, counsel supplemented his motion on November 4, 1987 with a copy of the bankruptcy petition filed on April 12, 1987. On November 9, 1987 that filing was verified by Harriet L. Mengert, Deputy Clerk of the United States Bankruptcy Court for the Southern District of New York.
[4] We note a typographical error in the judgment giving the amount as $3,499.00 rather than the stipulated amount of $3,499.29.