**Joyce PRESTON, Plaintiff,**

v.

**Roger N. KRUEZER and Blunt, Ellis & Loewi, Defendants.**

**No. 85 C 20271.**

United States District Court, N.D. Illinois, W.D.

Aug. 1, 1986.

Stephen P. Carponelli, Chicago, Ill., for plaintiff.

Thomas P. Ward, Chicago, Ill., Michael K. Havrilesko, Rockford, Ill., for defendants.

## ORDER

ROSZKOWSKI, District Judge.

In this securities fraud action, plaintiff Joyce Preston asserts federal statutory claims under Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q (the "1933 Act") (Count I); Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78 (the "1934 Act") and Rule 10b–5, 17 C.F.R. § 240.10b–5, promulgated thereunder (Count II); and, the Racketeer Influenced and Corrupt Organizations Act of 1976 ("RICO"), 18 U.S.C. §§ 1962(a), (c) (Counts III, IV). Plaintiff also asserts a pendent violation of the Illinois Consumer Fraud

and Deceptive Business Practices Act, Ill. Rev.Stat. ch. 121½, ¶ 261 *et seq.* (the "Consumer Fraud Act") (Count V) and claims for breach of fiduciary duty (Count VI), common law fraud (Count VII) and "infliction of emotional distress" (Count VIII).

Defendants Blunt, Ellis & Loewi, Inc. ("Blunt Ellis") and Roger Kruezer filed the instant motion pursuant to Section 3 and 4 of the Federal Arbitration Act, 9 U.S.C. §§ 3, 4 (1970), to compel arbitration of all claims and to stay this action pending arbitration. Defendants also move to dismiss Counts I, V and VIII of plaintiff's complaint.

For the reasons stated herein, defendants' motion to compel arbitration is granted with respect to Counts V, VI, VII, VIII. The arbitration is to be conducted before the American Arbitration Association in Chicago as elected by plaintiff. Arbitration is stayed pending resolution of this action. Defendants' motion to dismiss is granted with respect to Count I. Counts II, III and IV will remain in this court and will proceed without delay.

## I. BACKGROUND [1]

Plaintiff is a widow with two dependent children. Defendant Kruezer is a stock broker and is the manager of defendant Blunt Ellis' Freeport, Illinois office.

In March of 1980, plaintiff approached Kruezer for investment advice. While she had only modest income from periodic work as a grocery and drug store checker, plaintiff had approximately $22,000 she was interested in investing.[2] Plaintiff had little education or investment knowledge. Kruezer told plaintiff that he would invest her funds in safe, secure, growth-oriented investments designed to produce capital appreciation. Based on these representations, plaintiff used her money to open an account with Blunt Ellis.

During the time plaintiff's account at Blunt Ellis remained open, Kruezer allegedly made numerous factual misrepresenations. Kruezer also allegedly failed to inform plaintiff of various material facts concerning her account. Specifically, Kruezer failed to explain plaintiff's account statements despite repeated requests. In September of 1982, Kruezer told plaintiff her account had a value of $50,000 when in fact its actual value was substantially lower. In January 1984, Kruezer told plaintiff that the value of her account was $30,000 when in fact it was worth substantially less. On various occasions Kruezer told plaintiff her investments were "doing fine" and that "everything's OK" when in fact she was losing substantial amounts of money. Kruezer failed to inform plaintiff of the high-risk, income oriented nature of her investments. Kruezer allegedly initiated trades and "churned"[3] plaintiff's account solely to generate commissions.

Plaintiff closed her Blunt Ellis account in the fall of 1984 and filed this lawsuit in September of 1985.

On September 25, 1985, counsel for Blunt Ellis wrote plaintiff to remind her that she had agreed to submit any account disputes to arbitration. Counsel demanded that plaintiff elect an arbitration forum within five days. Counsel closed by informing plaintiff that should she fail to elect a forum, Blunt Ellis would proceed to arbitration before the New York Stock Exchange, Inc.

Plaintiff's attorneys responded by registered mail on October 1. Their letter informed Blunt Ellis that they intended to proceed with this litigation "unless and until an appropriate order is entered by the court staying proceedings." They informed Blunt Ellis that the arbitration

---

**1.** The background facts are taken from plaintiff's complaint. For purposes of the instant motions they must be taken as true.

**2.** Defendants state in the memorandum in support of their instant motions that the $22,000 represented the proceeds from the sale of some corporate stock owned by plaintiff.

**3.** "Churning" occurs when an account has been excessively traded to generate commissions in contravention to an investor's expressed investment goals. *Saxe v. E.F. Hutton & Co., Inc.,* 789 F.2d 105, 112 (2d Cir.1986).

agreement did not cover claims against Kruezer; that the agreement was unenforceable; and that it did not encompass the claims presented by this case. Plaintiff's attorneys closed by stating that if this court were to ultimately determine that arbitration was indeed appropriate, they reserved the right to proceed before the American Arbitration Association in Chicago, Illinois.

The instant motions followed.

## II. DISCUSSION

### A. DEFENDANTS' MOTION TO DISMISS

Before this court can determine which, if any, counts of plaintiff's complaint should be arbitrated, it is first necessary to determine which counts fail to state a claim for relief. Defendants have challenged the legal sufficiency of Counts I, V and VIII.

#### 1. Section 17(a) of the 1933 Act (Count I)

■ There is a split in the circuits as to whether an implied private right of action should be recognized under Section 17(a) of the 1933 Act. *See Mosher v. Kane,* 784 F.2d 1385, 1390–91 n. 9 (9th Cir.1986). The Supreme Court has recognized this split, *Eichler v. Berner,* 472 U.S. 299, 105 S.Ct. 2622, 2625 n. 9, 86 L.Ed.2d 215 (1985), but has on four occasions declined to decide the issue. *See Eichler, Id.; Herman & MacLean v. Huddleston,* 459 U.S. 375, 378 n. 2, 103 S.Ct. 683, 685 n. 2, 74 L.Ed.2d 548 (1983); *International Brotherhood of Teamsters v. Daniel,* 439 U.S. 551, 557 n. 9, 99 S.Ct. 790, 795 n. 9, 58 L.Ed.2d 808 (1979); *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 733 n. 6, 95 S.Ct. 1917, 1924 n. 6, 44 L.Ed.2d 539 (1975). While the Seventh Circuit has previously held that there is such an action, *Daniel v. International Brotherhood of Teamsters,* 561 F.2d 1223, 1244–46 (7th Cir.1977) *rev'd on other grounds,* 439 U.S. 551, 99 S.Ct. 790, 58 L.Ed.2d 808 (1979), the Supreme

Court's subsequent reversal of that case, "coupled with its express refusal to decide the § 17(a) issue ... removed the authority of the discussion in *Daniel." Teamsters Local 282 Pension Trust Fund v. Angelos,* 762 F.2d 522, 530–31 (7th Cir.1985). Since *Daniel,* the Seventh Circuit has on three occasions specifically declined to decide the existance of a private Section 17(a) cause of action. *See Ray v. Karris,* 780 F.2d 636, 641 n. 3 (7th Cir.1985); *Angelos, supra; Peoria Union Stock Yards, Inc. v. Penn Mutual Life Insurance,* 698 F.2d 320, 323 (7th Cir.1983).

■ When implying a statutory private cause of action, the central inquiry is whether Congress intended to create such an action. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran,* 456 U.S. 353, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982); *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). Most courts that have found a private right of action under Section 17(a) have done so without conducting an indepth analysis of the legislative intent. For example, in *Daniel,* the Seventh Circuit found a private Section 17(a) right of action merely "because there was 'little practical point in denying the existence of an action under § 17 once it is established that an aggrieved buyer has a private action under § 10(b) of the 1934 Act.'" 561 F.2d at 1245 n. 45 (quoting *Globus v. Law Research Service, Inc.,* 418 F.2d 1276, 1283–84 (2nd Cir.1969), *cert. denied,* 397 U.S. 913, 90 S.Ct. 913, 25 L.Ed.2d 93 (1970) ).[4] This same over-simplified approach to the problem was used again more recently in *Angelos.* 762 F.2d at 530 ("there is no reason to think that a § 17(a) action would have different elements [than a Rule 10b–5 action]...."). *See also Stephenson v. Calpine Conifers II, Ltd.,* 652 F.2d 808, 815 (9th Cir.1981) (found an implied private right of action under Section 17(a) "[i]n light of the minimal differences between § 17(a) ... and § 10(b)....").

---

**4.** The court in *Daniel* proceeded "on the assumption that the operative provisions of the anti-fraud sections of the 1933 and 1934 Acts are identical." 561 F.2d at 1245.

■ Despite the facial similarity between Section 17(a) [5] and Rule 10b–5 [6] the two have not been interpreted identically. Allegations of the defendant's scienter are an essential element of a plaintiff's Rule 10b–5 cause of action. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 201–06, 96 S.Ct. 1375, 1384–87, 47 L.Ed.2d 668 (1976). Section 17(a) on the other hand "requires scienter under § 17(a)(1), but not under § 17(a)(2) or § 17(a)(3)." *Aaron v. Securities Exchange Commission*, 446 U.S. 680, 697, 100 S.Ct. 1945, 1956, 64 L.Ed.2d 611 (1980).

A pre-*Aaron* panel of the Seventh Circuit had determined that Section 17(a) required proof of scienter when accompanying a viable Rule 10b–5 claim. *Sanders v. John Nuveen & Co., Inc.*, 554 F.2d 790, 795 (7th Cir.1977). *Aaron* casts considerable doubt on the continued validity of this portion of *Sanders.* While *Aaron* dealt only with an SEC enforcement action under Section 17(a), "it is doubtful that a different interpretation would be given if an implied private cause of action is found to exist." *Landry v. All American Assurance Co.*, 688 F.2d 381, 387 (5th Cir.1982).

> Given this assumption, § 17(a) suddenly becomes an attractive, viable alternative to actions previously brought under Rule 10b–5, at least as to those based on negligence.

*Id.*

Since the Seventh Circuit has yet to resolve the Section 17(a) issue this court is free to follow the well-reasoned decision in *Landry.* No purpose is served by reciting the lengthy analysis set forth in *Landry.* It is sufficient to note that after conducting a detailed review of the four elements set forth in *Cort v. Ash* for implying a cause of action, the Fifth Circuit concluded that no private right of action exists under Section 17(a). *Landry,* 688 F.2d at 387–90. The *Landry* court found support for its holding from "such noted authorities on securities law as Professors Loss and Ruder." *Beck v. Cantor, Fitzgerald & Company, Inc.*, 621 F.Supp. 1547, 1560 (N.D.Ill.1985). Numerous other courts have been persuaded by *Landry's* exhaustive analysis. *See, e.g., In Re Storage Technology Corporate Securities Litigation,* 630 F.Supp 1072, 1079–80 (D.Colo.1986); *Akers v. Bonifasi,* 629 F.Supp. 1212, 1222 (M.D.Tenn.1985); *Scharp v. Cralin & Co.,* 617 F.Supp. 476, 478 (S.D.Fla.1985); *Beck, supra; Jones v. First Equity Corp. of Florida,* 607 F.Supp. 350, 355 (E.D.Tenn.1985) (relied on in *Media General, Inc. v. Tanner,* 625 F.Supp. 237, 245 (W.D.Tenn.1985)); *Ackerman v. Clinical Data, Inc.,* [Current] Fed.Sec.L. Rep. (CCH) ¶ 92,207, 91,570 (S.D.N.Y.1985); *In Re Diasonics Securities Litigation,* 599 F.Supp. 447, 460–62 (N.D.Cal.1984); *Roskos v. Shearson American Express, Inc.,* 589 F.Supp. 627, 629–31 (E.D.Wis.1984).

Count I of plaintiff's complaint is therefore dismissed.

---

**5.** Section 17(a) provides that:
> (a) It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—
> (1) to employ any device, scheme, or artifice to defraud, or
> (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
> (3) To engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchase.

**6.** Rule 10b–5 provides that:
> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or the mails or of any facility of any national securities exchange,
> (a) To employ any device, scheme, or artifice to defraud,
> (b) To make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances, under which they were made, not misleading,
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

### 2. Illinois Consumer Fraud and Deceptive Business Practices Act (Count V)

■ Plaintiff alleges in Count V of her complaint that defendants' conduct violates Illinois' Consumer Fraud and Deceptive Business Practices Act, Ill.Rev.Stat., ch. 121½, ¶ 261 *et seq.* (the "Consumer Fraud Act"). Section 2 of the Consumer Fraud Act provides in relevant part that:

> unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact ... in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby....

*Id.* ¶ 262. The Act provides a private right of action for damages or any other relief the court deems appropriate, *id.* ¶ 270a, including attorney's fees. *Id.* ¶ 270a(c)

A defendant's state of mind is immaterial under the Consumer Fraud Act: "a defendant need not be motivated by an intent to deceive." *Warren v. LeMay,* 142 Ill. App.3d 550, 96 Ill.Dec. 418, 428, 491 N.E.2d 464, 474 (1986) (citation omitted).

> [A] violator's good or bad faith is not important. Even innocent misrepresentations may be actionable. By its own terms, the statute requires only that a violator intend for a purchaser to *rely* on his acts or omissions. A party is considered to intend the necessary consequences of his own acts or conduct.

*Id.* (emphasis in original) (citations omitted).

Section 11a of the Consumer Fraud Act provides that the "Act shall be liberally construed to effect [its] purposes...." Ill. Rev.Stat. ch. 121½, ¶ 271a. Accordingly, Illinois courts have interpreted the Act as:

> a clear mandate from the Illinois legislature that the courts of this State are to utilize the Consumer Fraud Act to the utmost degree in eradicating all forms of deceptive and unfair business practices and to grant appropriate remedies to defrauded consumers.

*American Buyers Club of Mt. Vernon v. Honecker,* 461 Ill.App.3d 252, 257, 5 Ill. Dec. 666, 670, 361 N.E.2d 1370, 1374 (1977). *See also Warren,* 96 Ill.Dec. at 425, 491 N.E.2d at 471 (1986).

In the face of this broad interpretation, defendants argue that the Consumer Fraud Act does not encompass claims by an investor against a broker-dealer. Defendants point out that Illinois has extensive "Blue Sky" legislation specifically covering the purchase and sale of securities. *See* Ill. Rev.Stat. ch. 121½, ¶ 137.1 *et seq.* Since the civil remedy afforded by this legislation has expressly applied to securities dealers and their salespersons for many years, *id,* ¶ 137.13, defendants argue that the Illinois legislature could not have intended the Consumer Fraud Act to govern this already well regulated area.

Defendants' position is substantially undercut by the recent decision in *Onesti v. Thomson McKinnon Securities, Inc.,* 619 F.Supp. 1262 (N.D.Ill.1985). Faced with pleadings virtually identical to plaintiff's, the *Onesti* court held that the Illinois Consumer Fraud Act applies to securities disputes between investors and their broker dealers. The basis for this holding was an earlier Illinois appellate court decision that had ruled that "intangible" merchandise under the Act, *see* Ill.Rev.Stat. ch. 121½, ¶ 261(b), included such "ordinary sense" items as "certificates of stocks, bonds, promissory notes and franchises." *People ex rel. Scott v. Cardet International, Inc.,* 24 Ill.App.3d 740, 744, 321 N.E.2d 386, 390 (1974).

On its face, the Consumer Fraud Act makes no exception for securities cases. The Act has been held applicable to such other highly regulated areas as commodities, *see Heinold Commodities, Inc. v. McCarty,* 513 F.Supp. 311, 313 (N.D.Ill. 1979), and insurance. *See Barr Co. v. Safeco Insurance Company of American,* 583 F.Supp. 248, 258 (N.D.Ill.1984). The

Act expressly provides for situations where it might collide with other state or federal statutory schemes by making conformity with such schemes an affirmative defense to Consumer Fraud Act suits. Ill.Rev.Stat. ch. 121½, ¶ 270b(1).[7] *See Mario's Butcher Shop & Food Center v. Armour Co.*, 574 F.Supp. 653, 655–56 (N.D.Ill.1983).

Defendants' motion to dismiss Count IV is therefore denied.

### 3. "Infliction of Emotional Distress" (Count VIII)

■ The complaint is unclear as to exactly what form of "emotional distress" is being claimed in Count VIII. In her response to the instant motions however plaintiff clarifies the basis as being the Illinois tort "intentional infliction of emotional distress."

The gravamen of the Illinois tort of intentional infliction of emotional distress is extreme and outrageous conduct. *Bast v. Ford Motor Credit Corp.*, 631 F.2d 508 (7th Cir.1980).

> The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or trivialities. "It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that this conduct has been characterized by "malice" or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency."

*Id.* at 509 (quoting *Public Finance Corp. v. Davis*, 66 Ill.2d 85, 4 Ill.Dec. 652, 654, 360 N.E.2d 765, 767 (1976)).

The Illinois Supreme Court has also narrowly circumscribed the type of injuries for which recovery is allowed.

> [I]nfliction of emotional distress alone is not sufficient to give rise to a cause of action. The emotional distress must be severe. Although fright, horror, grief, shame, humiliation, worry, etc. may fall within the ambit of the term "emotional distress", these mental conditions alone are not actionable. "The law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it. The intensity and the duration of the distress are factors to be considered in determining its severity."

*Bast*, 631 F.2d at 509–10 (*quoting Davis*, 4 Ill.Dec. at 654, 360 N.E.2d at 767). *See also Baltz v. County of Will*, 609 F.Supp. 992, 996–97 (N.D.Ill.1985).

The gist of defendants' argument for dismissal of Count VIII is that their conduct was not sufficiently "extreme and outrageous". Taking the allegations of the complaint as true, as this court must at this point, this case involves the loss by a sophisticated brokerage house of a substantial sum of money invested by a poor, uneducated, widow. Depending on the exact facts surrounding the loss, plaintiff may indeed be able to show sufficiently outrageous conduct to hold defendants liable for intentional infliction of emotional distress. She should at least be allowed to try. At this state of the case this court is unaware of the intensity and duration of plaintiff's claimed distress and is not prepared to say as a matter of law that plaintiff can prove no set of facts which will allow her to recover under this theory.

It is worth noting that *Davis* held that "the extreme and outrageous character of the conduct may arise from an abuse of a position or relation with another which gives the actor actual or apparent authority over the other or power to affect his interests." 4 Ill.Dec. at 654, 360 N.E.2d at 767. Given that the debtor-creditor relationship satisfies this test, it is not inconceivable

---

**7.** Paragraph 270b(1) provides that:

§ 10b. Nothing in this Act shall apply to: (1) Actions or transactions specifically authorized by laws administered by any regulatory body or officer acting under statutory authority of this State or the United States.

that the investor-broker relationship might be a sufficient "special relationship" to ease plaintiffs' burden of meeting the exceedingly difficult standard for recovery under this tort.

Defendants' motion to dismiss Count VIII is therefore denied.

## B. DEFENDANTS' MOTION TO COMPEL ARBITRATION

Defendants seek to compel arbitration based on the provisions contained in two written account agreements signed by plaintiff on March 13, 1980, one entitled "General Account Agreement", the other, "Option Account Agreement". Paragraph sixteen of the eighteen paragraph General Account agreement provides that:

### 16. ARBITRATION

If any controversy arises between us in connection with my account or accounts it shall be settled by arbitration in accordance with the rules of either the Board of Arbitration of the New York Stock Exchange or the American Arbitration Association as I may elect. If I do not make such election by registered mail addressed to you at your main office within five (5) days after receipt of notice from you requesting such election, then you may so elect. Any arbitration shall be before at least three arbitrators and the award of the arbitrators, or a majority of them, shall be final, and judgment upon the award rendered may be entered in any court, state or federal, having jurisdiction.

Relying on this language and numerous recent court decisions, defendants assert that all viable counts of the complaint are subject to arbitration.

The Federal Arbitration Act, 9 U.S.C. §§ 1 *et seq.*, governs the arbitrability of commercial disputes. Under Section 2 of the Act, a contractual arbitration provision "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." *Id.* § 2. Section 3 allows the court, if "satisfied that the issue involved ... is referrable to arbitration", to stay proceedings pending arbitration. *Id.* § 3. If a party to an arbitration agreement refuses to arbitrate, the other side may bring a motion to compel. *Id.* § 4. Once the court is convinced "that the making of the agreement to arbitrate or the failure to comply therewith is not in issue" the motion to compel should be granted and the parties should be directed to arbitrate. *Id.*

The Arbitration Act was designed to alleviate traditional judicial hostility toward arbitration and establish a federal policy favoring arbitration. *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, — U.S. —, 105 S.Ct. 3346, 3354 n. 14, 87 L.Ed.2d 444 (1985). By its terms, the Act leaves no room for the district courts to exercise discretion. *Dean Witter Reynolds, Inc. v. Byrd,* 470 U.S. 213, 105 S.Ct. 1238, 1241, 84 L.Ed.2d 158 (1985). "[A]greements to arbitrate must be enforced, absent a ground for revocation of the contractual agreement". *Id.*

Procedurally, the court must first determine whether the parties agreed to arbitrate the dispute.

The court is to make this determination by applying the "federal substantive law of arbitrability, applicable to any agreement within the coverage of the Act."

*Mitsubishi,* 105 S.Ct. at 3354 (quoting *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.,* 460 U.S. 1, 24, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983)). While this determination of arbitrability is to be made "with a healthy regard for the federal policy favoring arbitration", *Moses H. Cone Memorial Hospital,* 460 U.S. at 24, 103 S.Ct. at 941:

courts should remain attuned to well-supported claims that the agreement to arbitrate resulted from the sort of fraud or overwhelming economic power that would provide grounds "for the revocation of any contract."

*Mitsubishi,* 105 S.Ct. at 3354 (quoting 9 U.S.C. § 2). There may also be certain statutory claims for which "Congress itself has evinced an intention to preclude a waiv-

er of judicial remedies for the statutory rights at issue." *Id.* at 3355.

■ In short, in determining which, if any, claims in a particular case must be ordered to arbitration, the court must conduct a two-step inquiry. First, it must be determined whether the arbitration agreement reached the claims in question. Second, upon a finding that it did, the court must consider "whether legal constraints external to the parties' agreement foreclosed the arbitration of those claims." *Mitsubishi*, 105 S.Ct. at 3355.

As to the first inquiry, it is undisputed that the language of the arbitration agreement in this case is broad enough to cover all of plaintiff's claims. The agreement provides that "any controversy" that arises between plaintiff and defendants "in connection with [plaintiff's] account ... shall be settled by arbitration." All of plaintiff's allegations, including her statutory claims, arise out of defendants' handling of her account.

There can be no dispute that plaintiff's state law counts must be sent to arbitration. *Byrd* specifically held that:

> the Arbitration Act requires district courts to compel arbitration of pendant arbitrable claims when one of the parties files a motion to compel, even where the result would be the possibly inefficient maintenance of separate proceedings in different forums.

105 S.Ct. at 1241. Even before *Byrd* was decided, this had been the law in this circuit. *See Dickinson v. Heinold Securities, Inc.*, 661 F.2d 638, 646 (7th Cir.1981).

Plaintiff offers three reasons why arbitration should not be ordered in this case. Plaintiff first suggests that the arbitration clause is an unenforceable contract of adhesion. If this argument proves correct, even plaintiff's state law counts will not be forced to arbitration; it will be as if no arbitration clause ever existed. In the alternative, plaintiff argues that claims

brought under Rule 10b-5 of the 1934 Act and claims brought under RICO are non-arbitrable.

### 1. Adhesion Contract

Plaintiff points to her lack of education and defendants' "overwhelming economic power" to support her argument that the arbitration clause is an adhesion contract. Plaintiff also calls the court's attention to the General Account agreement, noting that it is a form agreement and contains no deletions or amendments. These facts combined, she argues, clearly show that the arbitration clause contained in the account agreement did not result from a negotiated, arms-length, transaction. Plaintiff therefore concludes that the arbitration clause is a contract of adhesion.[8]

Contracts of adhesion generally arise when a standardized form agreement is submitted to a party for acceptance without any opportunity to negotiate terms. *Finkle and Ross v. A.G. Becker Paribas, Inc.*, 622 F.Supp. 1505, 1511 (S.D.N.Y. 1985). The form agreement is usually drafted by the party having superior bargaining powers. *Id.* In the investment area:

> the investor is faced with an industry wide practice of including Arbitration Clauses in standardized brokerage contracts. As the investor faces the possibility of being excluded from the securities market unless he accepts such an agreement to arbitrate, such clauses come within the adhesion doctrine.

*Id.*

■ The mere fact that one party to a contract enjoyed little relative bargaining strength however cannot alone render a contractual provision unenforceable.

> Contract law would lose much of its meaning if unfavorable contract provisions could be challenged merely on the basis of the relative size of the contracting parties.

*v. Drexel Burnham Lambert, Inc.*, 791 F.2d 850, 854 (11th Cir.1986). Any contractual attacks on the account agreement as a whole can be settled by the arbitrator. *Id.*

---

**8.** Since plaintiff attacks only the arbitration clause rather than the account agreement as a whole, the unconscionability issue is one for judicial rather than arbitral resolution. *Miller*

*Pierson v. Dean, Witter, Reynolds, Inc.,* 742 F.2d 334, 339 (7th Cir.1984). Neither will the mere fact that the clause is contained in a form agreement support a finding of unconscionability. *Finkle and Ross,* 622 F.Supp. at 1511.

> As a consequence of current commerical realities, form forum clauses will control, absent a strong showing it [sic] should be set aside. For such a contract or clause to be void, it must fall within judicially imposed limits of enforcement. It will not be enforced against the weaker party when it is: (1) not within the reasonable expectations of said party or (2) within the reasonable expectations of the party, but, when considered in its context, it unduly oppressive, unconscionable or against public policy.

*Id.* at 1512 (citations omitted). *See also Pierson,* 742 F.2d at 339.

■ In light of the judicial and legislative presumption favoring arbitration, *see Mitsubishi,* pre-dispute arbitration clauses can hardly be said to be "against public policy". Nor are such clauses unduly oppressive. Sending a dispute to arbitration does not leave a plaintiff remediless, "it only limits the remedy and changes the forum in which they may air their ... complaints". *Pierson,* 742 F.2d at 340. Finally, given the prevalence of arbitration clause in investment account agreements, it would be difficult to say that they fall outside of the reasonable expectations of investors. *Finkle and Ross,* 622 F.Supp. at 1512.

■ This leaves only the question of "unconscionability". Under the two-part test set forth by Judge Wright in *Williams v. Walker-Thomas Furniture Co.,* 350 F.2d 445, 449 (D.C.Cir.1965) (cited with approval in *Pierson,* 742 F.2d at 339), unconscionability will be found where: (1) there is an absence of "meaningful choice" on the part of one of the parties; and, (2) the challenged contract terms are "unreasonably favorable" to the other party. Both conditions must be present for a finding of unconscionability.

As to "meaningful choice" the *Williams* court stated:

> Whether a meaningful choice is present in a particular case can only be determined by consideration of all circumstances surrounding the transaction. In many cases the meaningfulness of the choice is negated by a gross inequality of bargaining powers. The manner in which the contract was entered is also relevant to this consideration. Did each party to the contract, considering his obvious education or lack of it, have a reasonable opportunity to understand the terms of the contract, or were the important terms hidden in a maze of fine print and minimized by deceptive sales practices? Ordinarily, one who signs an agreement without full knowledge of its terms might be held to assume the risk that he has entered into a one-sided bargain. But when a party of little bargaining power, and hence little real choice, signs a commercially unreasonable contract with little or no knowlege of its terms, it is hardly likely that his consent, or even an objective manifestation of his consent, was ever given to all terms. In such a case the usual rule that the terms of the agreement are not to be questioned should be abandoned and the court should consider whether the terms of the contract are so unfair that enforcement should be withheld.

350 F.2d at 449–50 (footnotes omitted).

■ It can hardly be debated that this case meets the first, "meaningful choice", prong of the *Williams* unconscionability test. Plaintiff is uneducated, inexperienced at investing, and impecunious. Defendant Blunt Ellis on the other hand is a sophisticated and well-financed brokerage house. The arbitration clause is contained in a form agreement essentially used industry wide. Under these facts it would be hard to conclude that plaintiff exercised a "meaningful choice" when signing the investment contract containing the arbitration clause. If any fact pattern fits the first portion of the unconscionability test, this would seem to be it.

Plaintiff's unconscionability argument fails however to overcome the second, "unreasonably favorable", portion of the test set forth in *Williams*.

> [I]n determining reasonableness or fairness, the primary concern must be with the terms of the contract considered in light of the circumstances existing when the contract was made. The test is not simple, nor can it be mechanically applied. The terms are to be considered "in the light of the general commercial background and the commercial needs of the particular trade or case." Corbin suggests the test as being whether the terms are "so extreme as to appear unconscionable according to the modes and business practices of the time and place." 1 Corbin, [Contracts § 128 (1963)]. We think this formulation correctly states the test to be applied in those cases where no meaningful choice was exercised upon entering the contract.

350 F.2d at 450 (footnotes omitted).

Nothing about the arbitration clause in dispute suggests that it "unreasonably favors" the defendants. Indeed, plaintiff has in no way shown that arbitration favors defendants at all. While plaintiff implies that defendants would receive favorable treatment if this case is arbitrated "by a panel of defendants' fellow brokers" (presumably plaintiff means the New York Stock Exchange, Inc.), this is nothing more than unfounded speculation. Also the arbitration clause in dispute allows plaintiff an alternative arbitration forum, the American Arbitration Association. Plaintiff does not even suggest that the AAA is somehow biased in favor of brokerage houses.

Many of the routine disagreements between investors and their brokers can be effectively resolved through arbitration. Plaintiff has failed to show in any meaningful way that defendants would be favored in arbitration. As a result plaintiff's adhesion contract argument must fail. Given the strong federal policy favoring resolution of disputes through arbitration, the arbitration clause will be enforced, at least as to those counts of the complaint that are arbitrable.

### 2. Arbitrability of Rule 10b–5 of the 1934 Act (Count II)

In the landmark case of *Wilko v. Swan*, 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168 (1953), the Supreme Court held that securities claims arising under the 1933 Act are nonarbitrable. The Court based its holding primarily on two interrelated provisions of the 1933 Act, Sections 12(2) and 14. In enacting Section 12(2), Congress expressly provided for a "special right" to a private remedy, 346 U.S. at 434–35, 74 S.Ct. at 186–87, that differed substantially from the common law remedy. *Id.* at 431 n. 10, 74 S.Ct. at 184 n. 10. Section 14 voids "[a]ny condition, stipulation, or provision binding any person acquiring any security to waive compliance with any provision" of the 1933 Act. Reasoning that an arbitration agreement amounted to a "stipulation" to "waive" a "provision" of the 1933 Act (the "special" Section 12(2) private right of action), the *Wilko* Court held that the language of Section 14, combined with the Act's purpose of protecting securities purchasers, mandated that such arbitration agreements be held invalid. *Id.* at 438, 74 S.Ct. at 188. *See generally* Schaller and Schaller, *Applying the Wilko Doctrine's Anti-Arbitration Policy in Commodities Fraud Cases*, 61 Chi.-Kent L.Rev. 515, 529–32 (1985).

In *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974), the Court addressed the issue of whether the 1934 Act allowed enforcement of an arbitration clause contained in an international securities agreement. Noting the "crucial differences" between the international agreement and the domestic agreement involved in *Wilko*, the *Scherk* Court held that the arbitration agreement was enforceable against a claim arising under the 1934 Act. The *Scherk* Court determined that the harm to international trade outweighed any domestic policy considerations embodied in the securities laws.

This case ... provides no basis for a judgment that only United States laws and United States courts should determine this controversy in the face of a solemn agreement between the parties that such controversies be resolved elsewhere. The only contact between the United States and the transaction involved here is the fact that Alberto-Culver is an American corporation and the occurence of some—but by no means the greater part—of the pre-contract negotiations in this country. To determine that "American standards of fairness," ... must nonetheless govern the controversy demeans the standards of justice elsewhere in the world, and unnecessarily exalts the primacy of United States law over the laws of other countries.

417 U.S. at 517 n. 11, 94 S.Ct. at 2456 n. 11.

After *Scherk,* lower federal courts faced with the issue determined that *Wilko* rather than *Scherk* governed the arbitrability of domestic 1934 Act claims. *See Weissbuch v. Merrill Lynch, Pierce, Fenner & Smith,* 558 F.2d 831 (7th Cir.1977). *See also Pierson v. Dean, Witter, Reynolds, Inc.,* 742 F.2d 334, 338 (7th Cir.1984); *Surman v. Merrill Lynch, Pierce, Fenner & Smith,* 733 F.2d 59 (8th Cir.1984); *Belke v. Merrill Lynch, Pierce, Fenner & Smith,* 693 F.2d 1023, 1025 (11th Cir.1982); *Delancie v. Birr, Wilson & Co.,* 648 F.2d 1255, 1257–59 (9th Cir.1981); *Sibley v. Tandy,* 543 F.2d 540, 543 & n. 3 (5th Cir.1976), *cert. denied,* 434 U.S. 824, 98 S.Ct. 71, 54 L.Ed.2d 82 (1977); *Ayres v. Merrill Lynch, Pierce, Fenner & Smith,* 538 F.2d 532, 536–37 (3d Cir.) *cert. denied,* 429 U.S. 1010, 97 S.Ct. 542, 50 L.Ed.2d 619 (1976); *Greater Continental Corp. v. Schechter,* 422 F.2d 1100, 1103 (2d Cir.1970).

In determining that *Wilko* rather than *Scherk* should be expanded to encompass domestic 1934 Act claims, the Seventh Circuit in *Weissbuch* first noted that *Scherk* was expressly limited to agreements with "significant international contacts." 558

F.2d at 834. The *Weissbuch* court also pointed out that both parties in *Scherk* "possessed formidable financial interests and ... their arbitration agreement emerged from a period of prolonged and extensive negotiations." *Id.* at 835. *Wilko* on the other hand dealt with:

> "the relatively uninformed individual investor." Lacking bargaining power and extensive information about his investment, this type of individual is most vulnerable to securities swindles and in most need of the special protections and remedies afforded by the Securities laws.

*Id.* (quoting *Scherk,* 484 F.2d 611, 617 (7th Cir.1973) (Stevens, J., dissenting) *rev'd.,* 417 U.S. 506, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974)).

The *Weissbuch* court disposed of one final argument favoring arbitration relevant to this case. The defendant-broker in *Weissbuch* argued that the *Wilko* doctrine should not bar arbitration of Rule 10b–5 claims since the right of action under Rule 10b–5 is judicially implied while the Section 12(2) claim involved in *Wilko* is a "special right" expressly conferred by statute. Thus, unlike *Wilko,* the 1934 Act's anti-waiver section is not violated by compelling arbitration of Rule 10b–5 claims since Congress could not have intended that Rule 10b–5 claims be a "provision" of the 1934 Act subject to nonwaiver.[9] Noting that "[t]his distinction did not go unnoticed by the Supreme court in [*Scherk* ]," the *Weissbuch* court held that:

> The differences between the 1933 and 1934 Acts notwithstanding, we nevertheless continue to adhere to our belief that policy considerations mandate the application of *Wilko* to Rule 10b–5 situations absent the presence of international concerns.

558 F.2d at 835 (relying on *Ayres,* 538 F.2d at 536–37).

The propriety of extending the *Wilko* analysis to domestic Rule 10b–5 claims was recently called into question in *Dean, Wit-*

---

**9.** The non-waiver provisions of Section 29(a) of the 1934 Act are "equivalent" to those of Section 14 of the 1933 Act. *See Dean, Witter Reynolds,*

*Inc. v. Byrd,* 470 U.S. 213, 105 S.Ct. 1238, 1244, 84 L.Ed.2d 158 (1985) (White, J., dissenting).

*ter, Reynolds, Inc. v. Byrd*, 470 U.S. 213, 105 S.Ct. 1238 84 L.Ed.2d 158 (1985). While noting that *Scherk* questioned "the applicability of *Wilko* to claims under the 1934 Act", the *Byrd* Court nonetheless declined to resolve issue. *Id.* 105 S.Ct. at 1240 n. 1.[10] Justice White's concurrence in *Byrd*, however, strongly suggests that arbitration is proper for Rule 10b–5 claims. While acknowledging the similarity between the anti-waiver provisions of the 1933 and 1934 Acts, Justice White reasoned that the narrower jurisdiction under the 1934 Act and the implied rather than express nature of a cause of action under Rule 10b–5 distinguished claims under the 1934 Act from those arising under the 1933 Act. *Id.* at 1244. Justice White stopped short of stating that 1934 Act claims should be arbitrable. He merely stressed that "*Wilko's* reasoning cannot be mechanically transplanted to the 1934 Act" and "the question remains open and the contrary holdings of the lower courts must be viewed with some doubt." *Id.*

*Byrd* sparked a renewed debate concerning the arbitrability of domestic Rule 10b–5 claims. Numerous district courts have recently held that *Wilko* does not extend to 1934 Act causes of action and that Rule 10b–5 claims are therefore arbitrable. *See, e.g., Schriner v. Bear, Stearns & Co.*, 635 F.Supp. 373 (N.D.Cal.1986); *Fisher v. Prudential-Bache Securities, Inc.*, 635 F.Supp. 234 (D.Md.1986); *Sanders v. Robinson Humphrey/American Express, Inc.*, 634 F.Supp. 1048 (N.D.Ga.1986); *Cardona Tirado v. Shearson Lehman American Express, Inc.*, 634 F.Supp. 158 (D.P.R. 1986); *Bob Ladd, Inc. v. Adcock*, 633 F.Supp. 241 (E.D.Ark.1986); *Shotto v. Laub*, 632 F.Supp. 516 (D.Md.1986); *Baker v. Paine, Webber, Jackson & Curtis, Inc.*, 637 F.Supp. 419 (D.N.J.1986); *Sulit v. Dean Witter Reynolds, Inc.*, 54 U.S. L.W. 2584 (W.D.Mo.1986); *Ilan v. Shearson/American Express, Inc.*, 632 F.Supp. 886 (S.D.N.Y.1985); *Jope v. Bear Stearns & Co.*, 632 F.Supp. 140 (N.D.Cal.1985);

*Brener v. Becker, Paribas, Inc.*, 628 F.Supp. 442 (S.D.N.Y.1985); *Coonly v. Rotan Mosle, Inc.*, 630 F.Supp. 404 (W.D. Tex.1985); *Moncrieff v. Merrill, Lynch, Pierce, Fenner, & Smith, Inc.*, 623 F.Supp. 1005 (E.D.Mich.1985); *Prawer v. Dean Witter Reynolds, Inc.*, 626 F.Supp. 642 (D.Mass.1985); *Intre Sport Ltd. v. Kidder, Peabody & Co.*, 625 F.Supp. 1303 (S.D.N.Y. 1985); *Driscoll v. Smith Barney, Harris Upham & Co., Inc.*, 625 F.Supp. 25 (S.D.Fla 1985); *Ross v. Mathis*, 624 F.Supp. 110 (N.D.Ga.1985); *West v. Drexel Burnham Lambert, Inc.*, 623 F.Supp. 26 (W.D. Wash.1985); *Finkle and Ross v. A.G. Becker Paribas, Inc.*, 622 F.Supp. 1505 (S.D.N.Y.1985); *Land v. Dean Witter Reynolds, Inc.*, 617 F.Supp. 52 (E.D.Va. 1985); *Jarvis v. Dean Witter Reynolds, Inc.*, 614 F.Supp. 1146 (D.Vt.1985). These courts for the most part have relied on Justice White's concurrence in *Byrd* and the strong federal policy favoring arbitration. One court has gone so far as to question the continued viability of *Wilko*. *See Brener*, 628 F.Supp. at 448 (noting the *Wilko* majority's preference for judicial rather than arbitral decisionmaking in securities law cases, the court stated: "Arbitration procedures ... have become increasingly sophisticated since *Wilko* was decided. . . . ").

A lesser but significant number of post-*Byrd* district courts have declined to order Rule 10b–5 claims to arbitration. *See, e.g., Shapiro v. Merrill Lynch & Co.*, 634 F.Supp. 587 (S.D.Ohio 1986); *Bustamante v. Rotan Mosle, Inc.*, 633 F.Supp. 303 (S.D. Tex.1986); *Blomquist v. Churchill*, 633 F.Supp. 131 (D.S.C.1986); *Schnitzer v. Oppenheimer & Co., Inc.*, 633 F.Supp. 92 (D.Ore.1985); *Minnesota Odd Fellows Home Foundation v. Engler & Budd Co.*, 630 F.Supp. 797 (D.Minn.1986); *Bale v. Dean Witter Reynolds, Inc.*, 627 F.Supp. 650 (D.Minn.1986); *Leone v. Advest, Inc.*, 624 F.Supp. 297 (S.D.N.Y.1985); *Levendag v. Churchill*, 623 F.Supp. 620 (D.S.C.1985);

**10.** The defendant-broker in *Byrd* had not sought arbitration of the 1934 Act claims in the district court.

*Webb v. R. Rowland & Co., Inc.,* 613 F.Supp. 1123 (E.D.Mo.1985); *Rojas Cancanon v. Smith Barney, Harris Upham & Co.,* 612 F.Supp. 996 (S.D.Fla.1985); *Gorman v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.,* 609 F.Supp. 1054 (S.D.Fla 1985); *Gibson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* No. 84 C 7542 (N.D. Ill. June 18, 1985); *Dini v. Dean Witter Reynolds, Inc.,* No. Ca 84–4138–T (D.Mass. May 22, 1985). Most of these courts, while recognizing contrary indications in *Byrd,* have decided to follow the prior law in their circuit. *See, e.g., Bale,* 627 F.Supp. at 654; *Leone,* 624 F.Supp. at 302.

The court in *Levendag* found SEC Rule 15c2–2 persuasive in denying arbitration. Rule 15c2–2 states in relevant part that:

> It shall be a fraudulent, manipulative or deceptive act or practice for a broker or dealer to enter into an agreement with any public customer which purports to bind the customer to the arbitration of future disputes between them arising under the Federal securities laws, or to have in effect such an agreement, pursuant to which it effects transactions with or for a customer.

17 C.F.R. § 240.15c2–2. In denying arbitration, the *Levendag* court preferred:

> to await a more definitive statement from a larger following of United States Supreme Court justices or a ruling from the Fourth Circuit before taking a position that would effectively bar plaintiffs from a Congressionally granted right to judicial resolution of alleged federal securities law violations.

623 F.Supp. at 623.

The pro-arbitration forces were dealt a setback by the recent Second Circuit ruling in *McMahon v. Shearson/American Express, Inc.,* 788 F.2d 94 (2d Cir.1986). Reversing the district court's order to arbitrate the plaintiff's domestic Rule 10b–5 claim, the Second Circuit held that:

> the similarity of the non-waiver provisions, § 14 of the 1933 Act and § 29 of the 1934 Act, as well as the strong public policy concerns inherent in the securities laws and the legislative history that pre-

ceded their enactment, support the compelling need for a judicial forum in the resolution of securities law disputes.

*Id.* at 98. Recognizing that *Scherk* and *Byrd* "may cast some doubt" on whether the Supreme Court will ultimately rule in favor of arbitration for 1934 Act claims, the Second Circuit concluded that:

> it would be improvident for us to disregard clear judicial precedent in this circuit based on mere speculation. We think that the orderly administration of justice will be best served if we as one of the inferior courts follow Supreme Court precedent and adhere to the settled law of this circuit, and a fortiori the district courts should do likewise.

*Id.*

Most recently, the Ninth Circuit ruled that domestic 1934 Act claims are nonarbitrable. *Conover v. Dean Witter Reynolds, Inc.,* 794 F.2d 520 (9th Cir.1986). In *Miller v. Drexel Burnham Lambert, Inc.,* 791 F.2d 850, 854 (11th Cir.1986), the Eleventh Circuit also decided to follow prior circuit precedent and deny arbitration of a domestic Rule 10b–5 claim. In *Smoky Greenhaw Cotton Co., Inc. v. Merrill Lynch, Pierce, Fenner & Smith,* 785 F.2d 1274, 1275 n. 1 (5th Cir.1986), the Fifth Circuit stated, without discussion, that domestic 1934 Act claims were not arbitrable. The issue is currently before the Eighth Circuit for decision. *See Minnesota Odd Fellows,* 630 F.Supp. at 800 n. 3.

Defendants in this case point to *Byrd* and the large number of post-*Byrd* district court opinions favoring arbitration of 1934 Act claims to argue that *Weissbuch* is no longer valid precedent. Defendants essentially raise the arguments favoring arbitration discussed above, *i.e.* the implied rather than express nature of a Rule 10b–5 cause of action; the heightened sophistication of arbitration since *Wilko;* and, the increasingly favored use of arbitration found in recent Supreme Court decisions.

Admittedly, the Supreme Court has in recent years advanced a "liberal federal policy favoring arbitration agreements,"

*Moses H. Cone Memorial Hospital,* 460 U.S. at 24, 103 S.Ct. at 941, and has ordered enforcement of such agreements "unless Congress itself has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue." *Mitsubishi,* 105 S.Ct. at 3355. Arbitration's favored position in the federal scheme is nothing new however and did not go unnoticed by the Seventh Circuit in *Weissbuch.* The *Weissbuch* court simply held that from the "collision" between the "strong national policy favoring the recognition of arbitration agreements" and the "strong national policy rationale underpinning the Securities Acts of 1933 and 1934", the Securities Acts' right to judicial dispute resolution must emerge victorious. 558 F.2d at 833–34, 836.

The court in *Weissbuch* determined that the Congressional intent to preclude waiver of 1934 Act "provisions", was fully applicable to the judicially implied cause of action under Rule 10b–5. 558 F.2d at 835–36. Subsequent Supreme Court authority supports such a conclusion.

Implication of a private right of action under Section 10(b) of the 1934 Act requires a finding that Congress *intended* such an action. *See Curran* and *Cort, supra.* Assuming then that Congress intended an action under Section 10(b), leaving only the specifics to be fleshed out later, it is proper to conclude that Congress also intended the non-waiver provision of the 1934 Act to cover Section 10(b) "provision" along with all other 1934 Act provisions.

The Seventh Circuit's main concern in *Weissbuch* was that forcing arbitration of 1934 Act claims would deprive "the relatively uninformed individual investor" of "the special protections and remedies afforded by the securities laws". 558 F.2d at 835. While the Supreme Court has yet to issue a conclusive ruling on the arbitrability of domestic Rule 10b–5 claims, the Seventh Circuit has. No developments since *Weissbuch* substantially undercut its exhaustive and well-reasoned analysis. Like the Second Circuit in *McMahon,* this court feels that "it would be improvident ... to disregard clear judicial precedent in this circuit based on mere speculation." 788 F.2d at 98.

Defendants' motion to compel arbitration of plaintiff's Rule 10b–5 cause of action (Count II) is therefore denied.

### 3. RICO Arbitration (Counts III and IV)

Unlike the dispute over the arbitrability of domestic Rule 10b–5 claims, the dispute over the arbitrability of RICO claims is of a more recent vintage. The leading case arguing against arbitrability of RICO claims was at one time *S.A. Mineracao da Trindade—Samitri v. Utah International, Inc.,* 576 F.Supp. 566 (S.D.N.Y.1983), *aff'd on other grounds,* 745 F.2d 190 (2d Cir. 1984). The *Mineracao* court recognized two competing policies. The first was that of encouraging arbitration over litigation, especially in the context of a dispute involving international commerce. The favored position of arbitration, however, was overridden in the *Mineracao* court's opinion by the strong public policy favoring judicial resolution of RICO claims, even in an international context. 576 F.Supp. at 576–77. *Mineracao* relied heavily on earlier precedent denying arbitration in antitrust cases. *Id.* at 575.

*Mineracao* was partly undercut by the Supreme Court's decision in *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,* — U.S. —, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985). In *Mitsubishi,* the Supreme Court held that agreements to arbitrate international antitrust disputes were enforceable. The *Mitsubishi* Court based its holding, as it had in *Scherk* for international Rule 10b–5 claims, on "concerns of international comity, respect for the capacities of foreign and transnational tribunals, and sensitivity to the need of the international commercial system for predictability in the resolution of disputes...." 105 S.Ct. at 3355. Also like *Scherk,* the *Mitsubishi* Court expressly declined to decide whether arbitration was also the rule for domestic antitrust actions. *Id.*

Notwithstanding *Mitsubishi*, the reasoning of *Mineracao* was found to be "persuasive" by the Fifth Circuit in denying arbitration of a domestic RICO claim. *Smoky Greenhaw*, 785 F.2d at 1281. ("*Smoky Greenhaw I*"). Though *Smoky Greenhaw I* was decided after *Mitsubishi*, the Fifth Circuit overlooked *Mitsubishi* in reaching its decision. Upon later consideration of *Mitsubishi*, the Fifth Circuit amended *Smoky Greenhaw I* and remanded the issue of RICO arbitrability to the district court. *Smoky Greenhaw Cotton Co., Inc. v. Merrill Lynch, Pierce, Fenner & Smith*, 785 F.2d 1274 (5th Cir.1986). ("*Smoky Greenhaw II*"). *Smoky Greenhaw II* stated that *Mitsubishi* calls into "serious question" the reasoning underlying *Smoky Greenhaw I*. While *Mitsubishi* was expressly limited to international disputes, the court concluded that "its broad language may carry significance for domestic disputes as well." *Smoky Greenhaw II*, 785 F.2d 1274.

The Second Circuit in *McMahon* recently held that domestic RICO claims, like domestic Rule 10b–5 claims are nonarbitrable. As it had done for Rule 10b–5 claims, the *McMahon* court held firm to prior Second Circuit precedent in denying arbitration. 788 F.2d at 98. Like *Mineracao*, the *McMahon* court felt that the peculiarities of RICO made judicial resolution of RICO claims of paramount importance.

> Enforcement of the RICO statute is particularly appropriate in a judicial forum because of strong policy concerns, the need for development of the record, and judicial clarification and resulting consistency in resolving disputes under this relatively new statute.

*Id.* at 98–99.

As with the Rule 10b–5 arbitration issue, there is no Supreme Court or Seventh Circuit precedent to guide this court in reaching a decision. Also like the Rule 10b–5 issue, the courts are split regarding RICO arbitration. *Compare McMahon* (nonarbitrable); *Fisher v. Prudential-Bache Secu-*

rities, Inc., 635 F.Supp. 234, 237 (D.Md. 1986) (nonarbitrable); *Witt v. Merrill Lynch, Pierce, Fenner & Smith*, 602 F.Supp. 867, 870 (W.D.Pa.1985) (nonarbitrable); *Universal Marine Insurance Co. v. Beacon Insurance Co.*, 588 F.Supp. 735, 738 (W.D.N.C.1984) (nonarbitrable); *Wilcox v. Ho-Wing Sit*, 586 F.Supp. 561, 567 (N.D. Cal.1984) (nonarbitrable) *with Greenblatt v. Drexel Burnham Lambert, Inc.*, 763 F.2d 1352, 1361 (11th Cir.1985) (giving collateral estoppel effect to arbitrator's fact finding in a RICO case); *Steinberg v. Illinois Company, Inc.*, 635 F.Supp. 615 (N.D. Ill.1986) (arbitrable); *Bob Ladd, Inc. v. Adcock*, 633 F.Supp. 241, 243–44 (E.D.Ark. 1986) (arbitrable); *Gerhardstein v. Shearson/American Express, Inc.*, [Current] Fed.Sec.L.Rep. (CCH) ¶ 92,512 (N.D.Ohio 1986) (arbitrable); *Bale v. Dean Witter Reynolds, Inc.*, 627 F.Supp. 650 (D.Minn. 1986) (arbitrable); *Sacks v. Dean Witter Reynolds, Inc.*, 627 F.Supp. 377, 380 (C.D. Cal.1985) (arbitrable); *Ross v. Mathis*, 624 F.Supp. 110 (N.D.Ga.1985) (arbitrable); *West v. Drexel Burnham Lambert, Inc.*, 623 F.Supp. 26 (W.D.Wash.1985) (arbitrable).

Those courts that have recently found in favor of arbitration uniformly rely on *Mitsubishi* and *Byrd* and have uniformly ordered arbitration of Rule 10b–5 claims.[11] On the other hand, those courts that have denied arbitration have done so essentially because they considered the proper development of RICO too important to be left to arbitrators.

Adhering to the view that Rule 10b–5 claims are not arbitrable (as mandated by Seventh Circuit precedent) this court will also decline at this point to order arbitration of plaintiff's RICO claims. Again following the lead of the Second Circuit in *McMahon*, this court agrees that judicial expertise is necessary for the proper development of the RICO statute.

Defendants' motion to arbitrate plaintiff's RICO claims (Counts III and IV) is therefore denied.

---

**11.** The Maryland court's decision in *Fisher* is somewhat of an oddity. *Fisher* held that Rule

10b–5 claims are arbitrable but that RICO claims are not. 635 F.Supp. at 236–37.

### III. CONCLUSION

In summary, Count I of plaintiff's complaint is dismissed. State law Counts V, VI, VII and VIII are to be decided through arbitration. Plaintiff's election of the American Arbitration Association in Chicago will be enforced. Following the guidance of the Seventh Circuit in *Pierson, Dickinson* and *Weissbuch*, the arbitration is stayed pending resolution of the federal counts remaining in this court. *See Pierson*, 742 F.2d at 340 ("The trial court may avoid collateral estoppel and thereby protect its jurisdiction in difficult cases by staying arbitration of the arbitrable claims until federal securities act claims are resolved"); *Dickinson*, 661 F.2d at 643–46; *Weissbuch*, 558 F.2d at 833. The 1934 Act and RICO counts remaining in this court should proceed without delay.